**UNITED STATES of America,
Plaintiff, Appellee,**

v.

**Louis B. HOUFF, Jr., and C. E. Keefer,
Defendants and Third-Party Plaintiffs, Appellants,**

v.

**The C. F. SAUER COMPANY, Third-Party Defendant, Appellee.**

**No. 8725.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 11, 1962.

Decided Dec. 21, 1962.

William Rosenberger, Jr., Lynchburg, Va. (John L. Abbot and William L. Wilson, Lynchburg, Va., on brief), for appellant.

Thomas B. Mason, U. S. Atty., for appellee, United States of America.

R. E. Cabell, Jr., Richmond, Va., for appellee, C. F. Sauer Co.

Before SOPER and BOREMAN, Circuit Judges, and WINTER, District Judge.

WINTER, District Judge.

When appellee, the United States of America, assignee of a guaranty, a loan agreement and a note evidencing a loan made by The Campbell County Bank, of Rustburg, Virginia, to Famous Virginia Foods Corporation (hereafter called "Famous Foods"), under the provisions of the Small Business Administration Act (15 U.S.C.A. § 636), sued appellants, two officers of Famous Foods, and guarantors of the loan, on their agreement of guaranty, the lower court granted summary judgment for the appellee in the amount of $54,551.87, with interest. Because of the lack of diversity of citizenship between the appellants and the third-party defendant and the absence of a federal question, the lower court also denied appellant's motion for summary judgment and dismissed appellant's third-party complaint against The C. F. Sauer Company, which, subsequent to the making of the loan, acquired a controlling stock interest in Famous Foods. This appeal does not question the correctness of the dismissal of the third-party complaint. It raises only the correctness of one of the grounds advanced by appellants as a defense to summary judgment against them and the basis for their requested summary judgment which was denied, namely, whether they had been discharged on their guarantees by reason of an alleged material alteration of the loan agreement and the guaranty, without their consent, by the lender, and the assignee (appellee, United States of America). Since we agree with the determination of the lower court, we affirm.

The precise issue arises as follows: By a loan agreement, dated July 6, 1959, Famous Foods obtained a stand-by credit to borrow up to $225,000.00 from The Campbell County Bank, of Rustburg, Virginia (hereafter called the "Bank"). The loan was repayable in installments, at stated times, with the last payment due on June 25, 1960. Famous Foods pledged, as collateral security for payment of the debt, inventories of finished pickles, "having a current market value of not less than 154% of the amount of the debt which may be from time to time outstanding." Pickles were to be placed in a public warehouse and non-negotiable warehouse receipts were to be issued to the Bank. By other provisions of the agreement, it was stated, "Famous Foods may from time to time, *with the written consent of the Bank*, substitute collateral of like kind and value for which warehouse receipts shall be issued to the Bank, and all the provisions, conditions and warranties contained in this agreement shall be applicable to such substituted collateral * * *." (Emphasis supplied.)

Famous Foods, *"with the written consent of the Bank,"* was also given the right to withdraw collateral upon the prior payment to the Bank of 65% of its current market value, subject to the lim-

itation that the collateral might at no time be diminished to an aggregate value of less than 154% of the then outstanding debt. Additionally, Famous Foods agreed to deposit additional collateral with the warehouse company and to furnish the Bank with warehouse receipts as evidence thereof at any time that the current market value of the collateral fell below 154% of the then unpaid balance of the debt. "Current market value" for the purposes of the agreement was defined to mean the wholesale market price of the collateral f. o. b. the plant or factory of Famous Foods.

A number of other provisions customary to such loans were included in the loan agreement, including a provision that in the event of a default in repayment of the loan, breach of any covenant of the loan agreement, or an assignment for the benefit of creditors, bankruptcy or the like, the Bank, at its option, might declare the unpaid balance of the loan immediately due and payable, and might sell the collateral either as a whole, or in parts or parcels, and, after deducting the costs of sale, apply the proceeds derived therefrom to the payment of the debt. The Bank was also given the right to sell the note evidencing the debt, and to assign the loan agreement and its interest in the collateral.

At the time that the loan agreement was executed and the note given, appellants, jointly and severally, executed a guaranty agreement, guaranteeing to the Bank, and its assigns, the punctual payment of the indebtedness, both principal and interest, when due, whether by acceleration or otherwise. The guaranty agreement also provided:

> "The undersigned hereby grants to Bank full power, in its *uncontrolled discretion* and without notice to the undersigned, but *subject to the provisions of any agreement between the Debtor* [Famous Foods] *or any other party and Bank at the time in force*, to deal in any manner with the liabilities and the collateral
> * * *."

(Emphasis supplied.)

There were also further provisions, not pertinent here, which need not be recited.

By a subsequent agreement the loan agreement was amended, with appellants' written consent, to permit Famous Foods to withdraw collateral from the warehouse upon payment of 75% of the current market value of the collateral intended to be withdrawn (rather than 65% as originally), provided that the total collateral not be diminished to an aggregate value of less than 133⅓% of the outstanding amount of the debt at any time (rather than 154% as originally). The consent of the guarantors to this amendment was conditioned upon the fulfillment of certain conditions, which were apparently met, because there is no claim that they did not consent fully to this amendment.

On January 16, 1961, control of Famous Foods was sold to The C. F. Sauer Company, at a time when the unpaid principal amount of the loan, amounting to $123,313.20, was in default. On January 28, 1961, the Bank, acting pursuant to the advice of the Small Business Administration, to which were formally assigned the note and the loan agreement on March 6, 1961, and the agreement of guaranty on April 7, 1961, advised the warehouseman not to allow any more substitutions or temporary releases of the collateral under its warehouse certificates until further notice from the Bank. The collateral was thus frozen (except upon payment of 100% of the current market value of the collateral) from January 28, 1961 until February 15, 1961, for the stated reason of affording the Bank the opportunity to determine by actual inspection the nature and condition of the collateral. After February 15, 1961 withdrawals were again permitted and The C. F. Sauer Company tried to effect a compromise among creditors of Famous Foods. These efforts were unsuccessful and a petition in bankruptcy was filed March 3, 1961. The United States of America, acting through Small Business Administration, after the assignments to it were complete, foreclosed on the collateral and sold it at public auction.

When the proceeds of sale failed to liquidate the unpaid indebtedness, appellants were sued on their guaranty.

It is the act of the Bank in freezing the collateral which brings this case to us, because the appellants contend that freezing the collateral constituted an alteration of the loan agreement and the guaranty agreement, that the alteration was made without their knowledge or consent, and that, under established law, they were released from their guaranty, Logan v. Clark, 63 F.2d 973 (4 Cir. 1933). Stated otherwise, appellants contend that the Bank was limited to requiring payment of 75% of the current market value of the collateral as a condition to its withdrawal, and further limited to insisting that the aggregate value of the collateral should not be reduced below 133⅓%, but that, so long as these conditions were met, the Bank could not interfere with the withdrawal and substitution of collateral.

When this defense was advanced to the suit, to the appellee United States' motion for summary judgment, and as a basis for appellants' motion for summary judgment, it was rejected by the lower court, which said, " * * * it is a sufficient reply to this defense to call attention to the language of the withdrawal provision which provides that withdrawals might be made from time to time 'with the written consent of the Bank.' There is nothing in the agreement to limit the right of the bank to refuse to consent. Yet that refusal is what is complained of in this defense. Since the bank was only doing what the agreement clearly gave it the right to do the defense is without merit."

With this conclusion we agree. By the plain terms of the loan agreement, if the words employed therein are given their ordinary, usual and customary meaning, the Bank had the right to withhold permission to withdraw collateral and to withhold permission to substitute collateral, so that if this meaning is afforded the language it cannot be said that there was any alteration of the loan agreement and, hence, a material alteration of the guaranty agreement, with the effect of discharging appellants.

Appellants assert that they are within the exception to the rule, namely, that words will not be given their ordinary meaning if that will contravene the true intentions of the parties, William Schluderberg-T. J. Kurdle Co. v. Trice, 198 Va. 85, 92 S.E.2d 374 (1956). Appellants advance three reasons why the intention of the parties differs from the ordinary, usual and customary meaning of the language they employed.

First, it is argued that the basic scheme of the loan agreement was to maintain a free flow of goods in order that the debtor could meet his obligations and prosper and that it would defeat the intention of the parties so to construe the language in question to repose discretion in the Bank to refuse consent.

It is true that the basic purpose of inventory financing by the deposit of inventory in a field warehouse is to provide a free flow of goods so that the borrower may continue usual business operations and generate revenues to pay the loan, while obtaining credit secured by a pledge of its stock in trade, but it must be remembered that, in this type of credit arrangement more so than others, the lender lends moneys on the basis of collateral which may fluctuate widely in value. The true value of the collateral is not always the price placed on it by the manufacturer. It is, therefore, not unusual for a lender to insist that at all times it be in control of the collateral so that if, by reason of market fluctuations, the extent of its security is adversely affected and the borrower is unable to provide additional security, it can freeze and deal with the collateral in such a manner as to minimize the lender's potential loss.

Moreover, the loan agreement contains no separate provision entitling the lender to freeze the collateral in the event of a default on the part of the borrower, either in repayment of the loan or in the observance of any of its other covenants, so that, if the contention advanced by

appellants is adopted, the anomalous result follows that after an act of default in repayment the borrower can still withdraw collateral, upon payment of 75% of its current market value to the point of reduction of the collateral to 133⅓% of the unpaid balance of the loan, at the very time that the collateral may become distress merchandise and its actual market value may substantially disappear.

■ Appellants' second argument that the phrase in question was intended to be simply a mechanism for bookkeeping between the Bank and the warehouseman overlooks that such a mechanism already existed in the loan agreement without the necessity of invoking the phrase in question. By the terms of the loan agreement, the warehouseman issued non-negotiable warehouse receipts to the Bank as evidence of the merchandise placed by the borrower in the warehouse. Before the warehouseman could permit any withdrawal of such merchandise in its warehouse, the Bank would be required to endorse and surrender these receipts. In itself this process would constitute the record keeping appellants assert was required, without any necessity for resort to the phrase "with the written consent of the Bank."

■ Lastly, appellants rely upon the fact that when the loan agreement was amended to alter the conditions of withdrawal of collateral by changing the percentages to 75% of payment and 133⅓% of aggregate value, the written consent of the guarantors was sought and obtained. Appellants argue this permission was unnecessary if the language in question had the meaning afforded it by the lower court.

At the outset, it should be noted that the guaranty agreement gives the Bank a limited power to alter the loan agreement without the consent of the guarantors, but this limited power, by its terms, would not include an amendment of the type referred to. While we agree that if the language in question is given the meaning we afford it, it may have been unnecessary to obtain the consent of the guarantors to an amendment increasing the withdrawal percentage from 65% to 75% because the same practical result could be obtained by the Bank's unilaterally stating the increased percentage as a condition under which it would consent to the withdrawal of collateral. It by no means follows that such consent was unnecessary to a *reduction* of the aggregate collateral percentage from 154% to 133⅓%, because a reduction of this type would have the effect of imposing greater risk on the guarantors than they contracted for. The latter, we think, would constitute a material alteration which would discharge the guarantors if they did not consent.

It seems to us eminently reasonable that the original percentages were included in the loan agreement, so that the guarantors knew precisely what obligation they were guaranteeing, and, to the extent possible, the precise terms and conditions of that obligation as to minimum requirements. It follows that when those terms and conditions were subsequently altered, the consent of the guarantors should be obtained, if not entirely as a matter of legal necessity, at least as a matter of good business practice. Their consent thus does not provide any reason to depart from the plain, ordinary and usual meaning of the language in question.

William Schluderberg-T. J. Kurdle Co. v. Trice, supra, cited by appellants, need not concern us, because we believe that the construction we place on the words in question is in full accord with the intention of the parties, as that case requires.

The judgment of the lower court is Affirmed.