Wallace G. FREDERICK, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 22782.

United States Court of Appeals
Fifth Circuit.

Sept. 19, 1967.

Rehearing Denied Dec. 18, 1967.

O. F. Jones, III, Victoria, Tex., for appellant.

James R. Gough, John Forshay, Jr., Asst. U. S. Attys., Houston, Tex., for appellee.

Before WISDOM, COLEMAN and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

The trial court granted summary judgment for the plaintiff, the United States, and dismissed defendant's counterclaim. We reverse.

The suit arose out of a $100,000 loan made by the Small Business Administration (SBA) on March 16, 1960, to Frederick Dredging Company, Inc. ("the company" or "the corporation"). The debt was evidenced by a note executed for the corporation by Wallace G. Frederick (hereinafter "Frederick") as president; the note was not executed by Frederick individually. As security the corporation gave a mortgage on real estate located in Alabama and various personal property.[1] Frederick, individually, signed the usual SBA guaranty form, guaranteeing punctual payment of the note when due and agreeing that upon failure of the company to pay the note, whether due by acceleration or otherwise, he would, upon written demand of SBA, pay SBA the amount due and unpaid. As security for performance of the guaranty Frederick assigned to SBA life insurance with a cash surrender value of approximately $4,000.

The corporation became delinquent, and on March 16, 1962, SBA declared the note in default and accelerated. The United States then filed suit in the District Court for the Western District of Louisiana, against the company only.[2] On May 28, 1962, default judgment was entered against the company for a total of $102,720.69, consisting of a principal sum of $97,654.74, accumulated interest as of March 15, 1962, of $4,073,04, advances of $986.81 for preservation and care of collateral, interest of $7.10 as of March 15, 1962, on advances made for preservation of collateral, plus interest after March 15, 1962, at 5½% per annum on the principal amount until paid. The judgment recited that it was "with full recognition of complainant's special mortgage, lien and privilege upon the following described property," then listed various items of personal property including a dredge and a tug. The judgment directed that the described property be seized and sold by the United States Marshal for the Western District of Louisiana, "at public auction with appraisement, for cash, to the highest bidder," and the amount realized be credited pro tanto on the amount of the judgment and if not sufficient to discharge the judgment the unpaid balance would be enforceable against any property of the defendant.

On February 4, 1964, the United States began the present action. First it sued, on the note itself, in the United States District Court for the Southern District of Texas against "Wallace G. Frederick, d/b/a Frederick Dredging Company, Inc.," as alleged maker. The complaint recited execution of the note by the named defendant and default thereon, and claimed unpaid principal and interest of $44,759.13, plus interest from default on October 1, 1962, until paid.

Subsequently a First Amended Complaint was filed,[3] and attached as exhibits were a copy of the note and the guaranty; this pleading set out a claim on the guaranty against Frederick in his individual capacity, alleging that although requested he had failed and refused to pay the remaining principal and interest due on the note in accordance with his guaranty, to plaintiff's damage in the amount of $44,759.13, plus interest at 5½% per annum from date of default, to wit, October 1, 1962. Judgment was prayed against Frederick alone

---

1. The mortgage is not in the record. Also there appears to have been a supplemental chattel mortgage given by the corporation in October, 1960, on additional personal property, but the record does not disclose the nature of the property or what, if anything, has been done to realize on this collateral.

2. The only evidence of the Louisiana proceeding in the record is a copy of the judgment, made an exhibit to the motion for summary judgment; we are able to determine the relief sought only to the extent revealed by the judgment.

3. In its application for leave to file the First Amended Complaint the government stated as its reason "to include in the subject action the liability of the Defendant, Wallace G. Frederick, as guarantor of the promissory note set forth in the Original Complaint."

for said sum, with interest from the date of default.[4]

Plaintiff moved for summary judgment. The motion was submitted on the basis of the First Amended Complaint to which the note and guaranty were attached, additional exhibits (to the motion) consisting of a certified copy of the Louisiana judgment and an affidavit of an employee of SBA,[5] interrogatories and answers thereto (none of which is here material, except in one minor respect indicated below), and the sworn First Amended Answer and Counterclaim of Frederick.

Pursuant to Rule 54(b) the Court granted summary judgment for the United States on its claim but held the action could proceed as to Frederick's counterclaim.

## A. The Motion for Summary Judgment

In his sworn First Amended Answer and Counterclaim defendant denied that the United States was entitled to recover the sum of $44,759.13 with interest at 5½% per annum from October 1, 1962. As grounds for the denial he set out that on or about July 25, 1962, the United States Marshal for the Western District of Louisiana levied under a writ of execution upon property mortgaged to SBA and sold the same to an agent of the

SBA for $44,100, that the property foreclosed on had been appraised for approximately $299,000 when the loan was made, and said amount was then accepted by SBA as the fair market value thereof. Frederick charged that the purchase for $44,100 was "unconscionable and tainted with fraud" and that the purchase was void because of fraud and conspiracy of the Marshal and SBA. On the basis of the same allegations Frederick counterclaimed for damages against the United States.

■ The matters before the Court on the motion did not remove all material issues of disputed fact. Frederick admitted the note was due and payable and that he executed the guaranty. What is missing is proof by plaintiff of the amount of damages to which it is entitled. While defendant's pleadings could have been more artful it is plain he was denying under oath that he owed the sum sued for. Detailed allegation of operative facts, which were also asserted as the basis of a counterclaim, did not eliminate Frederick's denial. If the sworn Answer did nothing else it clearly put in issue the statement in the SBA affidavit that no part of the debt had been paid except as fully credited.

■ To recover, whether by summary judgment or trial on material issues, the government must prove the amount due

---

4. Questions of change of parties and service of process, arising from the amended complaint being against Frederick individually, are not before us, since Frederick appeared and answered. The United States took judgment against the individual only.

5. Material parts of the affidavit stated:

"2. That on March 16, 1960, Wallace G. Frederick became indebted to the United States, by and through Small Business Administration, in the amount of $100,000.00, as evidenced by promissory note dated March 16, 1960, executed by Frederick Dredging Company, Inc., and delivered to Small Business Administration, said note being secured by the guaranty of Wallace G. Frederick, a copy of said guaranty being attached hereto and marked Exhibit 'A.'

"3. That Wallace G. Frederick is justly and truly indebted to the United States under and by virtue of said promissory note, as of December 15, 1964, in the following amounts:

| | |
|---|---|
| Unpaid principal balance | $44,759.13 |
| Accrued interest on loan as of December 15, 1964 | 6,429.58 |
| Total | $51,188.71 |

Interest accrues after December 15, 1964, at the daily rate of $6.8382.

"4. That no part of said debt has been paid except as has been fully credited to said debt."

and unpaid on the note and hence due by the guarantor, unless the amount is admitted (and here it was not). The United States claimed $44,759.13 with interest from October 1, 1962, which as best we can tell, though this is not clear, is asserted as the date of default on the guaranty as opposed to default on the note. Even if we assume that effect is to be given the Louisiana judgment as judicially establishing the amount of, and the elements of, the principal's indebtedness so as to be binding on Frederick,[6] there is no explanation of how the total of $102,720.67 awarded was reduced to alleged unpaid principal of $44,759.13, as of December 15, 1964. It is not possible to tell how the interest of $6,429.58 referred to in the affidavit was calculated or from what date, and whether it included all, some, or none of the interest of $4,073.04 awarded by the court in Louisiana; this is especially confusing because the Louisiana suit claimed acceleration arising from default on March 16, 1962, and the Texas suit claims default on October 1, 1962.[6a] There was no information of what had happened concerning the advances for preservation of collateral (and interest thereon) awarded in the Louisiana judgment.[7]

Of course, the major factual deficiency was that nothing was stated concerning payment on the debt after it was reduced to judgment except the conclusionary statement in paragraph 4 of the affidavit that nothing had been paid except what had been fully credited—the form, date, amount and source of such payments were unrevealed, as well as whether the "payments" referred to were payments before judgment, realizations on security after judgment, or both. Presumably at least part of the credits arose from a sale which the Marshal was authorized by the judgment to hold. But authority to make a sale is not proof that the sale occurred, or of the amount of or application of the proceeds. The only facts before the Court of the proceeds of a sale consist of the statement in defendant's First Amended Answer, that the sale was for $44,100 and was to SBA. Applying this amount to the total of the Louisiana judgment leaves a balance of $58,620.69. Applying it solely to the principal recited in the judgment, leaves a principal balance of $53,554.24. And, as set out above, it is not possible to follow the calculations of interest. Even without the denial by Frederick we are unable to see how summary judgment

6. There is considerable doubt on this record that the Louisiana judgment binds the guarantor in those respects. A judgment against a principal conclusively establishes against a surety the fact of, and amount of, the principal's liability, except against defenses of fraud or collusion, if obtained in a suit of which surety had full knowledge and opportunity to defend. (While there are technical differences between a guarantor such as Frederick and a surety, they do not produce a different result here.) Unless it is shown that the surety had such knowledge and opportunity the judgment is at the most only prima facie evidence, at the least only some evidence to be considered by the jury, of the fact of and amount of the surety's indebtedness. Lake County v. Massachusetts Bonding and Insurance Co., 75 F.2d 6 (5th Cir., 1935); 2d appeal, 84 F.2d 115 (1936); Seaboard Surety v. Westwood Lake, Inc., 277 F.2d 397 (5th Cir.), cert. denied, 364 U.S. 821, 81 S.Ct. 55, 5 L.Ed.2d 50 (1960); Hopkins v. National Surety Co.,

154 La. 61, 97 So. 297 (1923). Cf., authority that a default judgment against the principal does not affect the surety in any respect. Fusz v. Trager, 39 La. Ann. 292, 1 So. 535 (1887); Allison v. Thomas and Rosenfeld, 29 La.Ann. 732 (1877). Plaintiff has shown no knowledge or opportunity by Frederick to defend the Louisiana case; whether service on the corporation was obtained by serving him, or whether he was still connected with the corporation when it was sued, is not revealed by the record. All these are questions appropriate for a trial, with a full record of the Louisiana case available.

6a. But the government's answers to interrogatories said both note and guaranty were "accelerated" on March 16, 1962.

7. The record also is silent as to what realization, if any, has been made on other security given by the corporation and the separate security given by Frederick securing his performance of the guaranty.

could be entered for a liquidated amount with any assurance of its correctness, considering the confusing and conflicting figures.[8]

■ The United States asserts that Frederick is making a collateral attack on the Louisiana judgment and that the burden was on him to put in the present record all the record of the Louisiana suit. This misses the mark. In the first place the evidentiary effect, if any, of the Louisiana judgment against Frederick depends on a showing by the government of more than it has here shown about the Louisiana case. Second, the guarantor's obligation is to pay only what is unpaid. The United States sued for such net amount, the amount was denied under oath, and the United States has not proved the net amount. It cannot shift to Frederick responsibility for its offering a part only of the Louisiana record, which part, to the extent it has any evidentiary effect against Frederick, shows only the gross amount of the principal's debt and nothing as to the net unpaid balance.

We conclude that the summary judgment was erroneously granted.

### B. The Counterclaim

After the grant of summary judgment the United States moved to dismiss the counterclaim, asserting sovereign immunity, and alternatively moved to transfer the cause to the Western District of Louisiana. The counterclaim was then limited by the defendant to an amount not in excess of the government's claim against him. The District Judge granted the motion to dismiss on three grounds: (1) sovereign immunity—that the counterclaim related to a claim of tort at the foreclosure sale, while the government's claim had been purely contractual, citing United States v. Finn, 239 F.2d 679 (9th

Cir., 1956), United States v. Patterson, 206 F.2d 345 (5th Cir., 1953) and related cases; (2) that defendant had not made claim with the General Accounting Office as required by 28 U.S.C.A. § 2406; (3) that no allegations showed the defendant was owner of any cause of action for tort at the foreclosure sale, that such a cause would belong to the corporation only and should have been disposed of in the foreclosure suit.

■ The guaranty gives wide powers to SBA to deal with the collateral assigned as security for its performance, including the right to purchase the security, but states "such powers [are] to be exercised only to the extent permitted by law." A guarantor, who is in broad terms a type of surety, has a beneficial interest in collateral held by the creditor for the principal debt, and the creditor must exercise good faith in preserving, applying and disposing of the security and the proceeds, not only for the sake of the creditor's security but in recognition of the guarantor's obligation. Misapplication of security is a defense to the guarantor in an action against him on his obligation. The guarantor cannot compel the creditor to go against the security (and the guaranty so states), but once the creditor does so he must do so without negligence and with due regard for the guarantor's interest in preservation of it and disposition of it for a proper value, for had the creditor not gone after the security the value of it would be subject to the guarantor's rights as subrogee of the creditor.[9] If a creditor irregularly or negligently sells security so that it produces less than its value the guarantor may sue the creditor for improperly preserving or applying the collateral, or, if sued, may set off the full value of the security against the amount otherwise due. Dil-

---

8. Hamlin v. Hamlin, 237 F.Supp. 299 (N. D.Miss., 1964) held summary judgment inappropriate to decide whether recited consideration in a deed was so grossly inadequate as to charge the United States with notice thereof, or to decide whether the recited value or the alleged actual value was the true value.

9. The guaranty recognizes the right of the guarantor to be subrogated to "collateral" (including the security given by the corporation) when SBA has been paid in full.

bert v. Wernicke, 214 F. 673 (6th Cir., 1914); Denson v. Gray, 113 Ala. 608, 21 So. 925 (1897); 72 C.J.S. Principal and Surety §§ 197–199, 206, 289–291, 299 (1951); 38 C.J.S. Guaranty § 81 (1943).

The guarantor's interest in the collateral exists in any case. But in addition this guaranty included in its definition of collateral for the performance thereof all collateral assigned by the corporation for the payment of the note.

If the United States mishandled the security, as claimed by defendant, it violated not only a duty imposed by law but also a duty imposed by the guaranty agreement itself.[10]

■ ■ What the defendant complains of is purchase by the government for its own account at an inadequate price. The rights of SBA to purchase at the sale, and its obligation as a mortgagee purchasing the security, depend upon the terms of the mortgage itself, the type of sale, and questions of choice of law, all of which cannot be answered on the fragmentary information before us. At this time it is sufficient to say that the mortgagee, if it conducts the sale, has as a minimum a duty to the mortgagor to conduct the sale openly and fairly, and, regardless of who conducts the sale, a duty not to purchase the property for a price so inadequate as to show bad faith. This is the minimum duty; the duty may be higher when a trial court has before it data on which to ascertain the applicable standard.

This brings us to consideration of sovereign immunity and whether appellant should have sought a credit from the General Accounting Office before asserting his counterclaim. We are concerned with the interplay of the doctrine of sovereign immunity, 28 U.S.C.A. § 2406 and Fed.R.Civ.P. 13.

Rule 13 provides for "counterclaims and cross-claims." A counterclaim under this rule is a claim of one party against an opposing party. It includes common law recoupment and set-off, which is statutory. Common law recoupment was equitable in nature, resting on the principle that it was equitable to settle in one action all claims growing out of the same contract or transaction; it was for defensive use only, and a defendant could not use it as the basis for an affirmative judgment in his favor. Under most statutes set-off at law is a demand asserted to diminish or extinguish plaintiff's demand, which arises out of a transaction different from that sued on, and generally must be liquidated and emerge from a contract or judgment. 3 Moore, Federal Practice, ¶ 13.02 at 8–9 (2d ed. 1966).

Rule 13 counterclaims include recoupment and set-off. The "arising out of the same transaction" requirement (which at common law the defendant had to meet to establish his right to assert the claim) has significance in distinguishing between the compulsory counterclaim of Rule 13(a), which must be pleaded if arising out of the same transaction or occurrence else it will be barred, and the permissive counterclaim of Rule 13(b), which does not arise out of the same transaction or occurrence and may be, but need not be, pleaded.

■ The distinction between recoupment and set-off has significance where a defendant sued by the United States asserts a claim as to which the government has made no statutory waiver of its sovereign immunity. 3 Moore, Fed-

---

10. While regularity of the sale is not before us, we point out that 28 U.S.C.A. § 2005 requires appraisal before a judicial sale if required by state law and not otherwise provided by the court. Whether the sale is a judicial sale or an execution may depend on whether confirmation is required. Weir v. United States, 339 F.2d 82 (8th Cir., 1964); 33 C.J.S. Executions § 196 (1942). We do not know whether confirmation was here required. If the sale was judicial Louisiana law requires appraisal before sale. LSA–C.C.P. art. 2332. We do not know whether the "appraisement" referred to in the judgment occurred. In briefs and pleadings the parties variously refer to the sale as an "execution sale" and an "order of foreclosure."

eral Practice, ¶ 13.02 at 9 n. 1. (2d ed. 1966).

 Both 13(a) and (b) are qualified by 13(d) in cases against the United States. United States v. Lashlee et al., 105 F.Supp. 184 (W.D.Ark., 1952). Rule 13(d) provides:

"Counterclaim Against the United States. These rules shall not be construed to enlarge beyond the limits now fixed by law the right to assert counterclaims or to claim credits against the United States or an officer or agency thereof."

Thus a defendant is either compelled by 13(a), or permitted by 13(b), to counterclaim against the sovereign within the limits to which the sovereign immunity has been given up by the United States by other provisions of law. The waiver can be by statutory consent to be sued [11] or by the institution of the particular action. Our conclusion is that when the sovereign sues it waives immunity as to claims of the defendant which assert matters in recoupment—arising out of the same transaction or occurrence which is the subject matter of the government's suit, and to the extent of defeating the government's claim but not to the extent of a judgment against the government which is affirmative in the sense of involving relief different in kind or nature to that sought by the government or in the sense of exceeding the amount of the government's claims; [12] but the sovereign does not waive immunity as to claims which do not meet the "same transaction or occurrence test" nor to claims of a different form or nature than that sought by it as plaintiff nor to claims exceeding in amount that sought by it as plaintiff.[13] In re Monongahela

Rye Liquors, Inc., 141 F.2d 864 (3rd Cir., 1944); United States v. Ringgold, 8 Pet. 150, 8 L.Ed. 899 (1834). Cf. Bull v. United States, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935); United States v. Macdaniel, 7 Pet. 1, 8 L.Ed. 587 (1833); 3 Moore, Federal Practice, ¶ 13.28 at 75–76 (2d ed. 1966). This ties in with the distinction made in Rule 13 itself. As defined in 13(c), a counterclaim may diminish or defeat the recovery sought by the opposite party—this far the government's waiver goes. It may also, but need not, "claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party." The government does not go so far as to waive its immunity to this kind of claim.

We do not understand Lacy v. United States, 216 F.2d 223 (5th Cir., 1954) to establish a rule in this circuit that in the absence of statutory waiver a sovereign does not waive sovereign immunity to any extent by filing suit. There the government sought an injunction to require defendant to remove structures from a transmission line easement of the TVA; defendant sought damages for trespass and an injunction compelling the United States to move the line, affirmative relief different in nature and exceeding in scope that sought by the government and not merely reducing the plaintiff's claim. United States v. Finn, supra, and United States v. Patterson, supra, relied upon by the trial court, also involved attempts by defendants to seek affirmative relief which was not to reduce or extinguish the government's recovery but to establish an independent right to recovery from the government.

11. For example, the consent of the government to be sued given by the Federal Tort Claims Act is a consent to the defendant's asserting his tort claim as a counterclaim. 3 Moore, Federal Practice, ¶13.29 (2d ed. 1966, Supp.1965); United States v. Harms, 96 F.Supp. 1022 (D.Colo., 1951); United States v. Rosati, 97 F.Supp. 747 (D.N.J., 1951).

12. The trial judge recognized this waiver of sovereign immunity but held defend-

ant's claim was a set-off, sounding in tort only, and that the claim was the property of the corporation in any event.

13. A claim as to which sovereign immunity is not waived could be one within the usual statutory definition of set-off, or it could be so different in origin or nature as to be outside the scope of set-off also.

Defendant's counterclaim here arises from the same transaction or occurrence.[14] Defendant is sued on the guaranty; the status of the parties created by that contract imposes on the plaintiff a duty to the guarantor to deal properly with the security hypothecated by the creditor.

 We turn now to the effect of § 2406.[15] As we construe this section, it has no application where the sovereign already has laid aside its immunity by statute or by filing suit. A claim which otherwise qualifies to be filed as a compulsory counterclaim against the government is not subject to § 2406. United States v. Frank, 207 F.Supp. 216 (S.D. New York 1962). Section 2406 does have application where the claim is asserted as a permissive counterclaim under Rule 13(b). See full discussion in United States v. Lashlee, 105 F.Supp. 184 (W.D.Ark., 1952).[16]

 It would be anomalous to hold that a defendant, in court in an action he did not bring, is required to plead a counterclaim against the government because it is compulsory under Rule 13 (a) but that once pleaded his counterclaim is subject to dismissal on the ground he had not, before being sued, taken affirmative action to seek an administrative "credit" of the General Accounting Office.[17] The anomaly would be even more pronounced where the defendant is, as here, a secondary obligor, partially insulated by the primary obligor and the security, and might never be called on to pay.[18]

These conclusions of the scope of § 2406 are consistent with its purpose of preventing the government from being surprised by claims it has not had time to consider administratively. Cox and Deck v. United States, 6 Pet. 172, 31 U.S. 172, 8 L.Ed. 359 (1832); United States

14. United States v. Houff, 202 F.Supp. 471, (W.D.Va.), aff'd 312 F.2d 6 (4th Cir., 1962) and United States v. Fyles, 253 F.Supp. 386 (D.Vt., 1965), are actions on SBA loans in which claims were made by the defendants similar to those here. Both courts treated the claims as affirmative defenses rather than the subject of counterclaims, which further indicates the right of Frederick to raise in this case the matters he complains of.

15. 28 U.S.C.A. § 2406: "In an action by the United States against an individual, evidence supporting the defendant's claim for a credit shall not be admitted unless he first proves that such claim has been disallowed, in whole or in part, by the General Accounting Office, or that he has, at the time of the trial, obtained possession of vouchers not previously procurable and has been prevented from presenting such claim to the General Accounting Office by absence from the United States or unavoidable accident."

16. There are other cases holding § 2406 not applicable where the defendant appears to assert a defense which is not in form a claim but establishes that the liability asserted by the United States does not exist. United States v. Pusey, 47 F.2d 22 (9th Cir., 1931) was a suit to recover a refund on estate taxes paid. The Court allowed the defendant to prove that the original assessment had been erroneous. Norton v. United States, 81 F. 819 (5th Cir., 1897) construing a statute similar

to § 2406, held that an argument that the money whose return was sued for had never come into the hands of the defendant was not a "claim for credit" hence the statutory process need not be observed.

Some cases construe § 2406 in a bookkeeping sense. United States v. Du Perow, 208 F. 895 (N.D.Ohio, 1913) suggests it applies only where defendant has dealt with the government in such a way that it is reasonable to expect the existence of an "account" with the government. Norton v. United States, supra, suggests "claim for credit" refers to a claim which is ordinarily represented by a "voucher."

17. In United States v. Houff, supra, and United States v. Fyles, supra, no question was raised of compliance with § 2406.

18. Where § 2406 is applicable we doubt that failure of a defendant to have complied should cause peremptory dismissal of a counterclaim. We recommend for use in appropriate cases the procedure followed by Judge Bootle in United States v. Farmers Seed and Feed Company, 181 F.Supp. 475 (M.D.Georgia, 1959), of agreeing to withhold judgment for a reasonable length of time to permit defendant to bring himself in compliance with § 2406, or some other procedure giving the defendant time to act while protecting the government against surprise.

v. Heard, 32 F.Supp. 39, 41 (W.D.Va., 1940). So long as the same transaction or occurrence is involved surprise is minimized.

The counterclaim was improperly dismissed.

■ The records, briefs and oral argument are contradictory as to the extent to which the government has by court order, or agreement, or otherwise, either cooperated or refused its cooperation, or made available to defendant, or refused to make available to him, information in its files relating to the alleged Louisiana sale, credits given on the note, and like data. We have no doubt that the guarantor is entitled to such information either by voluntary disclosure by the government or under appropriate orders of the court within applicable rules of discovery.

Reversed and remanded.

WISDOM, Circuit Judge (dissenting):

I respectfully dissent.

I would affirm the summary judgment. With deference, I submit that there is no genuine issue as to any material fact relating to the existence of the debt and the amount of the unpaid balance. The questions the Court raises *sua sponte* are spirits from the vasty deep. Frederick did not call them. And they do not come at the Court's call. For various reasons, the counterclaim should be dismissed.

I

The Government proved its claim by the following uncontested evidence: (1) the promissory note of the Frederick Dredging Company for $100,000, dated March 16, 1960, executed by Wallace G. Frederick, the defendant; (2) Frederick's guaranty of the note; (3) a certified copy of the judgment rendered in United States v. Frederick Dredging Co., No. 8784, Western District of Louisiana, May 28, 1962 against the Company in the principal sum of $97,654.74, plus $4,073.04 accumulated interest as of March 15, 1962, plus advances for preservation and case of collateral in the amount of $968.81, plus additional (legal) interest

at 5½ per cent on the principal after March 15, 1962; minus the amount of the proceeds derived from the sale of the collateral; (4) and affidavit by Ben F. Jones, Chief of the Small Business Administration, Liquidation Section stating the net unpaid balance due on the judgment. Jones's affidavit states also that no part of the debt has been paid except as fully credited. The judgment referred to recites that it is "with full recognition of the complainant's special mortgage, lien and privilege" on certain items of property described in the judgment. It orders the United States Marshall to seize and sell these items "at public auction with appraisement, for cash, to the highest bidder", the amount realized to be "credited pro tanto upon the amount of this judgment", the unpaid balance to be "executory and enforceable, in accordance with law, against any property belonging to said defendant."

Both parties agree that the judicial sale was held and that the Small Business Administration bought the property for $44,100. One of the questions the Court conjured up, however, was whether there was proof of the sale and of the amount realized.

Fed.R. Civ.P. 56(e), in part, provides:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Instead of filing counter-affidavits, as required by Rule 56(e), Frederick chose to rely upon the mere allegations in his pleadings. His original answer was in the form of a general denial. After the United States moved for summary judgment, Frederick filed an amended answer and counterclaim. In this pleading, as the district court noted, "Frederick asserted no defense to the claim of the

United States". He did not question the accuracy of Jones's figures showing the amount of the unpaid principal or the interest. He did not question that the property was sold in accordance with the judgment. His position is that the plaintiff was not entitled to recover, because collateral appraised at $299,000 was sold for the sum of $44,100. Before this Court, in his brief and argument, Frederick did not dispute the amount of the Government's claim for principal and interest. In effect, the truth of the Government's allegations is an essential element in his counterclaim.

## II

Judge Connally properly dismissed the counterclaim, citing pertinent authority omitted in the following quotation from his opinion. I agree with him.

"In his answer Frederick asserted no defense to the claim of the United States, but filed a counterclaim seeking actual and exemplary damages in the total sum of $1,000,000, alleging "fraud and conspiracy" on the part of the United States marshal and an official of the SBA in connection with the seizure and sale of the equipment. The allegation of liability is in the most general terms. It is set out in the footnote in entirety. No facts tending to show fraud are alleged (as required by Rule 9(b) F.R.Civ.P.). The pleading seems subject only to the interpretation that fraud is inherent in any foreclosure sale where the property brings substantially less than the value at which it was appraised by the mortgagee. * * * The counterclaim of defendant is a set-off, based on a different (alleged) transaction, occurring at a different time and place, and neither supported or refuted by the evidence relating to plaintiff's cause of action. The claim of the United States is purely contractual, based upon a writing executed March 16, 1960. To recover, plaintiff need only prove default of the maker of the note. The defendant's counterclaim, to the contrary, sounds in tort, the tortious conduct allegedly having occurred July 25, 1962, in connection with the foreclosure sale.

But disregarding the question of waiver of immunity, the defendant may not assert the counterclaim for other reasons. Bearing in mind that the present action is one by the United States against an individual, wherein the defendant makes claim for a credit, defendant is precluded from making proof thereof under terms of § 2406 of Title 28, U.S.C.A., unless and until the claim has been presented to the General Accounting Office. There is no allegation that this has been done, and from conferences with counsel I am confident that it has not.

Finally, there is no allegation in the pleadings to show that the defendant, an individual and officer of the corporate mortgagor, has become the owner of any cause of action of the nature which he seeks to assert by way of counterclaim. If, in fact, there was any tortious conduct by government personnel in connection with the foreclosure sale of the collateral, it would seem that the cause of action to recover therefor would repose in the mortgagor, and would raise issues which should have been disposed of in the foreclosure suit. Nothing to the contrary is shown here."

## III

Frederick's belatedly dreamt-up counterclaim could not affect the Government's claim except as a set-off. Frederick charges that the Small Business Administration entered into a fraudulent conspiracy with the United States Marshal in 1962 to sell for $44,100 property worth $299,000 in 1960. He wants the difference, $255,000, plus $750,000 more for damages.

If contrived for delay, Frederick's scheme succeeded. If contrived to cloud the summary judgment issue by creating a collateral dispute, the scheme succeeded. Frederick's dream-child was not mentioned in his original answer or in his answer to the plaintiff's motion to strike the

defendant's answer. It came only after the United States filed its motion for summary judgment. It saw its first light three years after the foreclosure and sale. It rests on misleading allegations, demonstrably false, which Frederick unquestionably knew were false and misleading.

Throughout its opinion the Court appears to have in mind possibilities which could occur only in a common law summary foreclosure. Unlike many states, Louisiana law allows only judicial foreclosures, thereby reducing the opportunity for chicanery and unfairness to the mortgagor. In Louisiana, the mortgagee has no control over the seizure and sale of mortgaged property. *And the law determines what is a minimum fair price after a fair appraisal. The appraisal is made by two appraisers, one appointed by the debtor and the other by the seizing creditor.* LSA–R.S. 13:4363–65; LSA–C.C.P. 2331–2343. The property must be advertised. The sale must bring two-thirds of the appraised value at the first offering. The marshal's return, the advertisement, the appraisal, the *proces verbal* of the sale, the act of judicial sale, and other pertinent documents are filed in the record. The district court has custody of the property seized and conducts the sale of the property through the United States Marshal or the Civil Sheriff (in state cases).

If Frederick had any legitimate complaint based on alleged irregularities or on the unfairness of the judicial sale, that complaint should have been lodged with the United States District Court in charge of the sale. Of course that would have embarrassed Frederick, for he was well aware of the exact property to be sold and what it was worth. The company of which he was president was served. *And he participated in the appraisal. Directly or through an agent, he approved the appraisal of the property.*

There is a very good reason why the property sold in 1962 brought much less than the appraised value of the property mortgaged in 1960: *The items of property seized and sold in 1962 were only a few more than half of the items mortgaged in 1960.* This fact sticks out like a sore thumb when the list of items included in the act of mortgage is laid down next to the list of property included in the district court's judgment ordering the sale. Dredge No. 1 and the tender and machine shop equipment and other items subject to the mortgage were not sold at the judicial sale. Obviously, they were not on the Company's premises when and where the rest of the property was seized. This, Frederick must have known.

I assume that the property not included in the judicial sale was not missing, but legitimately outside of the jurisdiction of this court. I assume too, that at some later date, perhaps without the advantages of a judicial sale, this property was summarily foreclosed on and sold. *The point is that Frederick patently attempted to deceive the Court by stating that all of the mortgaged property was sold for $44,100 and that he knew nothing about it until his attorneys in this case informed him of the facts.* He alleged:

"It is shown to the Court that the debt in question and which the writ of execution and sale were for the purpose of paying was made upon the basis of an appraisal of the market value of said equipment foreclosed upon which appraisal, in the approximate amount of $299,000.00 was accepted by the Small Business Administration as the fair value of the equipment pledged. It is accordingly shown to the Court that the purchase by the Small Business Administration of said equipment for the sum of $44,100.00 is unconscionable and tainted with fraud, that said purchase is void because of the fraud and conspiracy of the United States Marshal and the Small Business Administration official, and that the counter-plaintiff herein has been damaged in the amount of $255,125.00, for which he prays recovery * * *.

It is shown to the Court that Counter-plaintiff was not fully appraised of

the fraud and conspiracy until his attorneys began checking into the terms of the sale of the assets in question and the circumstances of the foreclosure and as a result Plaintiff did not discover the fraud and conspiracy of the agents and employees of the various Governmental Agencies until January, 1965."

## IV

Frederick's counterclaim rests solely on the false assumption that fraud must be inferred whenever the proceeds of a foreclosure sale fall far short of the appraised value of the property for purposes of a mortgage loan. I say "solely" because, as Judge Connally correctly pointed out, Frederick did not purport to allege any circumstances tending to show fraud except the differences in the two amounts. I say "false assumption" because, as this case demonstrates, on the face of the papers, (1) the property sold was not all of the property mortgaged; (2) the property sold brought two-thirds of an appraised value agreed to by Frederick; (3) the sale was a judicial sale conducted by the United States District Court and entitled to a presumption of validity, in the absence of any contention that the sale failed to meet the legal requirements of a judicial sale.

Frederick's counterclaim therefore should be dismissed. Among other reasons, he has failed to state a cause of action with the particularity required of fraud claims by Fed.R.Civ.P. 9(b).

## ON PETITION FOR REHEARING

PER CURIAM:

The petition for rehearing filed by the United States is denied.

It is appropriate that the original opinion be extended for the following observations.

An important point in the case was failure of the United States to prove the amount of damages to which it was entitled, i. e., the amount due and unpaid on the note to it and hence due by Frederick as guarantor. Even if assumed that the Louisiana judgment against the corporation established the fact of, and the amount of, Frederick's original liability as guarantor (a violent assumption, see footnote 6 of opinion), there remained two problems—establishing the balance remaining due on the Louisiana judgment after proper credits were given thereon from sale, which the Louisiana judgment directed be held, and establishing the unpaid balance due on the note at the time of this suit (which might or might not be the same as the balance due on the judgment, since it was not shown whether there were credits on the note balance from sources other than the Louisiana sale—see footnote 7 of opinion). The certified copy of the Louisiana judgment submitted by the United States in support of its motion for summary judgment showed only gross figures plus a direction to sell property and apply the proceeds against the gross. It was silent on the amount of proceeds derived from the sale directed to be held. The affidavit of Ben F. Jones did not settle the question of the amount remaining due on the Louisiana judgment, in fact it was not even evidentiary thereof. It did not deal with or even refer to the Louisiana judgment but was solely in terms of the note (see footnote 5 of opinion).

On the issue of the counterclaim, it was impossible for the trial court to have considered whether items of property which the Louisiana judgment directed be seized and sold were all or less than all of the items of property mortgaged in 1960. Neither the mortgage nor any list of mortgaged property was before the district court (see footnote 1 of opinion). What purports to be a copy of the mortgage was attached to appellant's brief on this appeal. That extra-legal document did not enlarge the record before this court or retrospectively alter what was before the district court.

WISDOM, Circuit Judge (dissenting).

Again I am constrained to dissent.

In giving decisive importance to an issue of fact not raised in the trial court and not raised in this Court in pleadings, briefs, or oral argument, the majority

oversteps the bounds of judicial review. Apparently, until this Court gratuitously informed the serendipitous defendant of his good fortune he was not aware of the possibility of a *factual* dispute over *his* indebtedness. Contrary to the opinion of the majority, Frederick did not contest the amount due and unpaid on the note— as to principal or interest. He filed no countervailing affidavits, as required by F.R.Civ.P. 56(e). In agreement with the complaint, he pleaded that the proceeds derived from the judicial sale amounted to $44,100. He did not contend that the government failed to credit him with any payment. He does not say that the government's computations are wrong. Indeed, he does not question any figures or facts alleged in the complaint relating to the government's claim. As Judge Connally found, "Frederick asserted no defense to the claim of the United States".

If Frederick was aware of the possibility of constructing a defense such as this Court constructed for him, he must have rejected the notion as too full of holes to be worth trying. Frederick, like Aesop's cat but unlike the fox, has only one trick for escaping his pursuers. His one defensive theory is that his counterclaim creates issues of material fact as to the existence of the conspiracy to defraud and the amount of his damages. He assumes that the amount of his recovery, if any, would be set off against his debt to the government and therefore that it is a question of fact as to the amount, if any, of the alleged deficiency.[1] The cat has a good trick— when its tree is not axed. Judge Connally felled Frederick's tree.

Frederick's claim in tort for fraud against the United States Marshal and certain SBA employees—none of whom, by the way, are parties to the suit—has nothing to do with the existence or the amount of the contractual claim of the United States against him for his indebtedness. For this and other reasons, the district court properly dismissed the counterclaim.

1. The appellant's brief makes this very clear. He states: "The only question in this case is whether or not there was a question of fact as to whether or not, after the sale of the mortgaged property, and the application of the proceeds of the sale to pay off the judgment, there actually did exist an unpaid balance on the Judgment, being the deficiency in the amount sued for by the Government. * * * It will quickly be seen that in a period of approximately two years the property involved had allegedly depreciated from $299,000.00 to $44,100.00, a depreciation in excess of $250,000.00. The nature of the property is such that common knowledge justifies a conclusion that such enormous depreciation would not ordinarily occur within so short a period of time. * * * It is Appellant's contention that the facts in this case are not so without dispute as to eliminate a question of fact as to the propriety of the sale by the Marshal, and to eliminate any controversy as to whether or not there does actually exist a deficiency. Appellant contends that the amount of the appraisal and the amount of the sale are so widely divergent that these facts by and of themselves create an issue of fact as to whether or not a valid, bona fide sale took place which gave full credit to Appellant of all he was entitled to receive by way of credit upon the Louisiana Judgment against him. Hamlin v. Hamlin, D.C.Miss.1964, 237 F.Supp. 299, 301. Without respect to whether Appellant would be entitled to recover from the Government for any fraudulent or bad faith activity, he is entitled to a determination of whether or not the sale realized the full value of the property securing the indebtedness. These questions would include questions of whether or not the Marshal and others, gave notice to the Appellant, the presence of other bidders, the question of what the property was subsequently sold for by the Small Business Administration for, an independent appraisal of the value of the property at the time of the sale, to compare with the appraisal at the time the loan was made, and other questions of fact that could be explored at the trial on the merits."

This quotation contains the substance of the appellant's almost citation-free brief of eight typed pages. There is not one word in the brief in support of the majority's statement, "An important point in the case was failure of the United States to prove the amount of the damages to which it was entitled, i. e., the amount due and unpaid on the note to it and hence due by Frederick as guarantor".

One of the district court's conclusions completely ignored by the majority is that Frederick failed to plead fraud with the specificity required by F.R.Civ.P. 9 (b). Actually, the only special fact on the face of the papers that shows any fraud relates to the fraud Frederick committed when he attempted to deceive the court by alleging that *all* of the mortgaged property, property allegedly worth $299,000 only two years before, was sold at the judicial sale for $44,100. Frederick unwittingly exposed his own deceit on appeal: he incorporated in his brief a copy of the act of mortgage containing a description of the mortgaged property. A comparison of the list of the property mortgaged with the list of the property sold shows, as Frederick well knew, that not all of the mortgaged property was seized and sold.

A basic error in the Court's opinion is its failure to give effect to state law governing judicial sales, as required by F.R.Civ.P. 69(a). Under Louisiana law, the creditor does not—as the Court seems to think—control the seizure and sale of mortgaged property. Such property may be seized and sold only under the eye of a court, here the United States District Court for the Western District of Louisiana. By law the property must be appraised by two appraisers, one appointed by the seizing creditor and the other by the debtor. LSA–R.S. 13:4364–65. The record in United States v. Frederick Dredging Co., No. 8784, Western District of Louisiana, shows that Frederick himself signed the required "appraisement list" in the capacity of "Appraiser for Defendant". Property sold must, at its first offering, after due advertisement, bring two-thirds of its appraised value. LSA–C.C.P. art. 2336. Here, as the foreclosure proceedings show, the appraisers agreed to an appraisal of $60,000 for the property seized and sold. Thus, the mortgagee, and Frederick, its president, knew exactly what property was sold, knew its appraised value, and knew that it brought in excess of two-thirds of its agreed appraised value.

Judicial sales carry a presumption of regularity, and a sheriff's (or marshal's deed) constitutes full proof until rebutted. LSA–R.S. 13:4355. See Vinton Oil & Sulphur Co. v. Gray, 1914, 135 La. 1049, 66 So. 357; Scott v. Gordon, 1935, 184 La. 1017, 168 So. 134; Gumina v. Dupas, La.App., 1965, 178 So.2d 291. Frederick makes no effort to specify any facts to rebut the presumptions of validity attached to judicial sales.

The district court properly dismissed the counterclaim. And since Frederick's only defense to the suit was the counterclaim, the district court properly rendered summary judgment in favor of the plaintiff.