BOWNES, Circuit Judge.
 

 This is an appeal from an order of the district court affirming the opinion and orders of the bankruptcy judge. The central issue is the validity of a settlement agreement between the receiver and the secured creditors of the bankrupt. A somewhat detailed exposition of the facts is necessary.
 

 Appellants
 
 [1]
 
 were the owners and operators of Maplewood Poultry Company, Clements Chicks, Inc., and Pierce Realty Co. (hereinafter Maplewood), a poultry processing business. During Maplewood’s operations, loans were obtained from the Farmer Production Credit Association (PCA), the Federal Land Bank (FLB), and the Economic Development Administration (EDA). The EDA loan, which was in the amount of one million dollars, was guaranteed by the individual appellants. In August of 1979, Maplewood instituted a Chapter XI bankruptcy proceeding. It continued to run the business until January 23, 1980, when a receiver was appointed. The receiver continued the business and operations in the ordinary course and in wind-down until March 10, 1980.
 

 On December 13, 1980, the receiver, with bankruptcy court approval, agreed to sell Maplewood’s capital stock and certain other assets in order to resume business operations and fund a plan of arrangement. All three government agencies, PCA, FLB, and EDA, had or claimed liens on various assets of Maplewood as collateral for their respective loans. PCA claimed,
 
 inter alia,
 
 a first security interest in the “live bird” inventory and its liquidation proceeds, amounting to approximately $200,000. EDA claimed a second security in the same asset. The receiver challenged the enforceability of the PCA first security interest in the “live bird” inventory on the basis that PCA had, by failing to file properly, not perfected its security lien. EDA and PCA had competing claims to other collateral. It seemed apparent that if PCA’s security interest in the “live bird” inventory and proceeds was held unenforceable, the balance due PCA would be recovered from the other collateral on which PCA and EDA had competing claims and thus EDA’s recovery prospects would be diminished. The receiver, EDA, PCA, and FLB therefore worked out a settlement agreement that provided for fixed amounts of payments to each secured creditor in exchange for release of their rights in the collateral securing their loans.
 
 [2]
 
 The
 
 *182
 
 appellants-guarantors objected to the settlement, arguing that they were entitled as a matter of right to have the proceeds of all the EDA collateral directly applied in satisfaction of the EDA claim, thus reducing
 
 pro tanto
 
 their guaranty obligation.
 

 The bankruptcy judge approved the settlement. In a detailed opinion, he ruled that appellants-guarantors had, under the terms of the guaranty agreement, waived any right to control the disposition of the collateral. The bankruptcy judge specifically found that, if there were no settlement, “little, if any, of the ‘live bird’ inventory proceeds would remain for application to the EDA claim” and that the settlement provisions “represent a reasonable adjustment of the differences of the parties, which was arrived at in good faith and is in the best interests of the estate.”
 

 The district court affirmed, finding that the bankruptcy judge’s factual findings were supported by substantial evidence and not clearly erroneous, and that his conclusions of law were entirely correct.
 

 Appellants argue that the guaranty agreement did not constitute a waiver for two reasons: first, because the language does not permit of such an interpretation; and, second, because the applicable law requires that the EDA collateral be directly applied to the satisfaction of the EDA claim.
 

 Appellants also contend that the settlement agreement “violates the fundamental rights of the guarantors to have the proceeds of collateral applied toward the principal indebtedness.”
 

 The Guaranty Agreement
 

 We find simply untenable appellants’ argument that the words of the guaranty agreement do not constitute a waiver of the guarantors’ rights to any control over the collateral. The agreement explicitly provides for an unconditional guarantee of payment. After an all-inclusive definition of “collateral,” there is the following paragraph:
 

 The undersigned waives any notice of the incurring by the Debtor at any time of any of the Liabilities, and waives any and all presentment, demand, protest or notice of dishonor, nonpayment, or other default with respect to any of the Liabilities and any obligation- of any party at any time comprised in the Collateral. The undersigned hereby grants to Lender full power, in its uncontrolled discretion and without notice to the undersigned, but subject to the provisions of any agreement between the Debtor or any other party and Lender at the time in force, to deal in any manner with the Liabilities and the Collateral, including, but without limiting the generality of the foregoing, the following powers[.]
 

 Included in the specific powers are:
 

 (b) To enter into any agreement of forbearance with respect to all or any part of the Liabilities, or with respect to all or any part of the Collateral,
 
 *183
 
 and to change the terms of any such agreement;
 

 and
 

 (d) To consent to the substitution, exchange, or release of all or any part of the Collateral, whether or not the Collateral, if any, received by Lender upon any such substitution, exchange, or release shall be of the same or of a different character or value than the Collateral surrendered by Lender[.]
 

 The statement of specific powers is followed by this paragraph: “The obligations of the undersigned hereunder shall not be released, discharged or in any way affected, nor shall the undersigned have any rights or recourse against Lender, by reason of any action Lender may take or omit to take under the foregoing powers.”
 

 The words of the guaranty clearly constitute an unconditional surrender by the guarantors of any rights in the collateral.
 

 We next examine the case law to determine if it affords any succor to appellants. The guaranty states that it “shall be interpreted and enforced in accordance with applicable Federal law,” so it is that on which we focus. The eases take two divergent approaches to a creditor’s duty to a guarantor in disposing of collateral: one looks primarily to the language of the guaranty agreement, the other applies the test of “commercially reasonable” to the disposition of the collateral regardless of the wording of the guaranty. Two Fifth Circuit cases are illustrative. In
 
 Frederick v. United States,
 
 386 F.2d 481, 486 (5th Cir. 1967), the court held that a creditor has a duty to “exercise good faith in preserving, applying and disposing of the security” despite the wide powers given to the creditor by the guaranty. The court found the basis for the “good faith” obligation in the guaranty’s statement that “such powers [to deal with the collateral] [are] to be exercised only to the extent permitted by law.” We note that this phrase is used in the guaranty before us only at the end of paragraph (e) of the enumerated powers, which has to do with the public or private sale of the collateral. We need not, however, determine the applicability of
 
 Frederick
 
 because the holding on which appellants rely was effectively overruled in
 
 United States v. Proctor,
 
 504 F.2d 954 (5th Cir. 1974), which held that, because the guaranty imposed no obligation to protect the guarantors’ right of subrogation or to perfect security interests in collateral specifically, it was not necessary to decide whether there was such an obligation under common law or the laws of Alabama. “For it is clear from a reading of the terms of the guaranty that the guarantors in this case waived whatever rights they may have to protection of their subrogation interests to all but a limited extent.”
 
 Id.
 
 at 956-57.
 
 [3]
 

 The Ninth Circuit places primary emphasis on the language of the guaranty. In
 
 First Nat. Park Bank v. Johnson,
 
 553 F.2d 599 (9th Cir. 1977), the court held “[w]here a guaranty is unconditional, a creditor, at least absent willful or grossly negligent waste or misconduct, may recover a deficiency judgment from an unconditional guarantor without regard to the creditors’ treatment of the collateral.”
 
 Id.
 
 at 602. In a case, somewhat similar to ours, the guarantors of an SBA loan to a family-owned poultry processing corporation that went into bankruptcy were sued by the SBA for the deficiency on the loan after the SBA bid in the collateral at the trustee’s sale. The court held that because “the agreement permitted the SBA to release the collateral entirely without consent of the guarantors^] . . . the SBA did not act in breach of any obligation that it had to the guarantors.”
 
 United States v. Bertie,
 
 529 F.2d 506, 507 (9th Cir. 1976).
 

 The Sixth Circuit, in
 
 United States v. Beardslee,
 
 562 F.2d 1016 (6th Cir. 1977),
 
 cert. denied,
 
 439 U.S. 833, 99 S.Ct. 113, 58 L.Ed.2d 128 (1978), held as a matter of federal law that the clear and unambiguous language contained in an SBA guaranty authorized without more the release of the principal debtor without discharging the obligation of the guarantors.
 
 Id.
 
 at 1023. In
 
 *184
 
 a subsequent case, however, the Sixth Circuit embraced the doctrine of “commercial good faith” explicitly holding that “even the contractual obligations of unconditional guarantors are protected by the doctrine of commercial good faith.”
 
 United States v. Willis,
 
 593 F.2d 247, 255 (6th Cir. 1979). It must be noted that the issue in
 
 Willis
 
 was “whether and, if so, to what extent a secured party can collect a deficiency from guarantors after being charged with having needlessly dissipated the collateral which might have substantially reduced, if not completely extinguished, the indebtedness secured by the guaranty.”
 
 Id.
 
 at 254-55.
 

 The rule in the Eighth Circuit is that, as a matter of federal law, the sale of collateral must be “commercially reasonable” regardless of the terms of the guaranty. Its reasoning is that this is a requirement of the Uniform Commercial Code, U.C.C. §§ 9-501(3)(b), 9-504(3), which has become the source of general commercial law.
 
 United States v. Conrad Pub. Co.,
 
 589 F.2d 949, 952-53 (8th Cir. 1978).
 

 Our canvass of the eases convinces us that they are of no help to appellants. Even if we assume, without deciding, that the “commercially reasonable” (or good faith) doctrine applies, there was no violation of it by the EDA. It could not be found to have acted negligently or unreasonably in entering into the settlement with the receiver and the other secured creditors. Indeed, it might have been found so if it had not become a party to the agreement. The bankruptcy judge found that if the agreement were not approved, “the balance due PCA would be recovered from other collateral on which EDA holds competing claims, thus seriously eroding the recovery prospects of EDA as well.” This would mean, of course, that the guarantors would be stripped of additional collateral insulation and exposed to greater individual liability.
 

 The “fundamental rights” claim of appellants is neither fundamental nor right. Their reliance on
 
 Louisville Stock Bank v. Radford,
 
 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), that, somehow, they were deprived of property without due process of law is totally misplaced.
 
 Radford
 
 held that the Frazier-Lemke Act, insofar as it interfered with a bank foreclosure of mortgaged property, was unconstitutional because it took bank property without just compensation. The case had nothing to do with the duties of a secured creditor to guarantors in disposing of collateral. Nor do we find any of the state cases cited by the appellants applicable.
 

 Affirmed.
 

 [1]
 

 . Carl Mendelson, Doris Mendelson, Sara Men-delson, Dorothy Higer, and Maine Coast Realty, Inc.
 

 [2]
 

 . The essentials of the eight and one-half-page stipulation and settlement agreement are as follows:
 

 The receiver would recognize the validity, perfection, enforceability and amounts owed as follows:
 

 
 *182
 
 PCA $104,585.96, plus interest to the date of payment and counsel fees not to exceed $15,000;
 

 FLB $482,453.07, plus interest to the date of payment and counsel fees not to exceed $35,000;
 

 EDA a maximum of $1,100,000 without further interest or costs.
 

 The following amounts are to be paid from cash presently on deposit with the receiver:
 

 $100,000.00 to PCA, less $31,000, an amount which represents PCA’s and FLB's contribution to the receiver for costs of collateral preservation incurred and paid from estate funds;
 

 $100,000.00 to EDA, less $50,000, an amount which represents the EDA contribution to the receiver for the costs of collateral preservation incurred and paid from estate funds.
 

 PCA, FLB and EDA are to receive the net proceeds realized from the sale of real property covered by mortgage deeds after deducting all direct costs of sale and a
 
 7'k%
 
 disbursement to the receiver for distribution as ordered by the court.
 

 EDA is to receive one half the net proceeds realized from the sale of all personal property.
 

 PCA, FLB and EDA are to assign to the receiver all rights, claims or property interests such creditors may have by virtue of their various loans and security interests; without recourse, representations or warranty.
 

 [3]
 

 . Judge Godbold, who wrote the majority opinion in
 
 Frederick,
 
 dissented in
 
 Proctor.