22 F.3d 1472
 23 UCC Rep.Serv.2d 596
 FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate
capacity, Plaintiff-Appellee,
v.
Larry O. HULSEY, an individual; Larry O. Hulsey & Co., a
Texas corporation, Defendants-Third Party
Plaintiffs-Appellants,
v.
CONTINENTAL ILLINOIS NATIONAL BANK & TRUST COMPANY OF
CHICAGO, a national banking corporation,
Third-Party Defendant-Appellee.
 No. 92-6334.
 United States Court of Appeals,
Tenth Circuit.
 April 13, 1994.
 
 Karen L. Howick (Anita M. Moorman and J. David Jacobson with her on the briefs) of Karen L. Howick & Associates, Oklahoma City, OK, for appellant.
 Ricki Valerie Sonders (John C. Platt and Jane S. Eulberg of Edwards, Sonders & Propester, Oklahoma City, OK, with her on the briefs; Ann E. DuRoss, Asst. Gen. Counsel, Colleen B. Bombardier, Sr. Counsel, Christopher J. Bellotto, Counsel, of counsel, F.D.I.C., Washington, DC, with her on the briefs).
 Before TACHA, Circuit Judge, BARRETT, Senior Circuit Judge, and KANE*, District Judge.
 BARRETT, Senior Circuit Judge.
 
 
 1
 Defendants-Appellants, Larry O. Hulsey & Co. (LOH & Co.), a Texas corporation, and Larry O. Hulsey (Hulsey) appeal from: the district court's Orders dismissing their counterclaims against the Federal Deposit Insurance Corporation (FDIC); the district court's Orders which granted summary judgment in favor of the FDIC on numerous affirmative defenses; and the district court's finding of facts and conclusions of law in its Final Journal Entry of Judgment. Hulsey, individually, also appeals the district court's Order granting summary judgment in favor of the FDIC which denied Hulsey exoneration as guarantor of the LOH & Co. loan.
 
 Factual Background
 
 2
 LOH & Co. entered into a loan transaction in October, 1982, with Continental Illinois National Bank and Trust Company of Chicago (CINB). In exchange for a $5,000,000 revolving line of credit, LOH & Co. executed a Secured Note, a Secured Revolving Credit Agreement, as well as mortgages and pledges in oil and gas leaseholds.[1] Hulsey, President and sole owner of LOH & Co., personally guaranteed LOH & Co.'s debt and also executed mortgages covering his own oil and gas leaseholds as security. The mortgages were filed in the Oklahoma counties in which the oil and gas wells were located.
 
 
 3
 The original credit line was for $1,700,000 which allowed LOH & Co. to consolidate other loans, expand its business, and pay operating expenses. On November 14, 1983, and December 20, 1984, LOH & Co. and CINB executed amendments which increased the line of credit to $2,400,000 in 1983 and to $4,250,000 in 1984. The First Amendment in 1983 changed the maturity date of the note from October 1, 1987 to November 1, 1988 and included additional oil and gas properties under CINB's mortgage to secure the increased line of credit. (Appellants' Appendix at 104, 106). The Second Amendment in 1984 acknowledged that an informal amendment to the Credit Agreement increasing the loan to $3,400,000 had occurred after the First Amendment. Id. at 113.
 
 
 4
 Under the Third Amendment, effectuated in October, 1986, the credit line was converted to a conventional term loan of $4,500,000, equaling the amount of principal drawn on the credit line. Id. at 117-18. The parties agreed that the maturity date stated in the note was the original date of October 1, 1987. Id. at 118. The Third Amendment also closed LOH & Co.'s line of credit, adjusted the interest rate provisions, provided for repayment on a term basis, and provided for the grant of additional collateral to the Bank. Id. at 117. Moreover, in the Third Amendment, LOH & Co. waived any right to a trial by jury in any action or proceeding to enforce or defend any rights under the Credit Agreement or any amendments. Id. at 120.
 
 
 5
 At the time that LOH & Co. acquired its 1982 credit line, CINB was managing and liquidating, on behalf of the FDIC, numerous Oklahoma oil and gas properties which the FDIC had acquired from a separate insolvent bank. About the time of the First Amendment in November, 1983, CINB became insolvent, necessitating a subsequent bailout by the FDIC. On August 23, 1984, CINB and the FDIC entered into various agreements under which the FDIC assumed CINB's indebtedness in exchange for certain loan transfers and a note payable. As agreed, CINB could satisfy the note payable by conveying additional loans to the FDIC at any time. Moreover, under a service agreement, CINB would receive compensation for administering the loans which it had transferred to the FDIC.
 
 
 6
 On June 29, 1987, CINB transferred LOH & Co.'s loan to the FDIC. Following this transfer, LOH & Co. was notified that it must be liquidated to satisfy the loan. LOH & Co. contacted CINB, which was now administering the loan on the FDIC's behalf, to discuss a possible settlement.
 
 
 7
 Between June 29, 1987, and November 1, 1988, Hulsey met and corresponded with three different CINB/FDIC account officers. It is disputed whether an acceptable settlement agreement was reached during this time. However, it is clear that no formal agreement was executed. On November 1, 1988, CINB terminated its service agreement and thereafter the FDIC began administering LOH & Co.'s loan. Following the FDIC's takeover of the loan administration, LOH & Co. assigned some oil and gas production payments from one of its gas leases and continued to send financial information to the FDIC.
 
 
 8
 In July, 1989, the sixth consecutive account officer assigned to administer the LOH & Co. loan sent a demand letter for additional financial information so that settlement negotiations could continue. LOH & Co. provided the requested information. Later that year, all discussion between the FDIC and LOH & Co. broke down when the FDIC contacted third-party purchasers and operators of the oil and gas properties and began intercepting payments to LOH & Co. after October, 1989.
 
 Procedural History
 
 9
 The FDIC filed its foreclosure action on September 7, 1990. In response, LOH & Co. and Hulsey, jointly, alleged a number of affirmative defenses and filed counterclaims seeking compensatory and punitive damages for fraud/intentional misrepresentation, constructive fraud/breach of fiduciary duty, tortious interference with business activities, intentional infliction of emotional distress, negligence, breach of contract, and breach of implied covenant of good faith and fair dealing. Also, LOH & Co. and Hulsey, jointly, filed a third party complaint against CINB which was settled and is not a part of this appeal.
 
 
 10
 The defenses and counterclaims, as applied to the FDIC, alleged that the FDIC was responsible for CINB's conduct during the period before the loan was transferred to the FDIC (pre-transfer), because of agency or contract assignment principles, as well as for its own conduct after the loan was transferred (post-transfer).
 
 
 11
 The FDIC, as well as LOH & Co. and Hulsey, jointly, moved for summary judgment on most of LOH & Co.'s affirmative defenses. Hulsey, individually, moved for summary judgment by exoneration under his guaranty agreement. The FDIC also moved to dismiss all counterclaims against it and it filed, in the alternative, a suggestion that the district court lacked jurisdiction to decide the contract counterclaim.
 
 
 12
 Thereafter, the district court dismissed most of the counterclaims[2] and granted summary judgment in favor of the FDIC on most of the affirmative defenses and on Hulsey's guaranty agreement. By subsequent Order, the court dismissed, without prejudice for lack of jurisdiction, the remaining portion of the breach of contract and implied covenant of good faith and fair dealing counterclaims which sought damages from the FDIC for breach of the post-transfer settlement agreement. The district court concluded that exclusive jurisdiction of those counterclaims was with the United States Claims Court (Claims Court) under 28 U.S.C. Secs. 1346(a) and 1491(a) because the amount in controversy exceeded $10,000.
 
 
 13
 When all of the Orders were filed, only the FDIC's foreclosure suit and two of LOH & Co.'s affirmative defenses remained for trial. The two remaining affirmative defenses were based on the FDIC's post-transfer actions in failing to preserve and protect the collateral and interfering with LOH & Co.'s correspondence. Before trial, LOH & Co. and Hulsey confessed judgment on the remaining issues in order to take an immediate appeal.
 
 
 14
 LOH & Co. and Hulsey thereafter filed suit for damages against the United States in the Claims Court on the same basis as their dismissed breach of contract and breach of the implied covenant of good faith and fair dealing counterclaims and filed this appeal.[3] After the appeal was taken, appellants filed a motion to transfer this appeal to the United States Court of Appeals for the Federal Circuit (Federal Circuit).
 
 
 15
 LOH & Co. and Hulsey set forth the issues on appeal as whether the district court erred in (1) dismissing for lack of jurisdiction and then granting summary judgment in favor of the FDIC on certain of the breach of contract and breach of the implied covenant of good faith and fair dealing counterclaims; (2) granting summary judgment in favor of the FDIC on its principal suit and the affirmative defenses relating to the diversion of the oil and gas proceeds; (3) dismissing the tort-based counterclaims; (4) granting summary judgment in favor of the FDIC on the promissory estoppel defense; (5) ruling that the FDIC was not subject to the affirmative defense of laches; (6) entering findings of fact and conclusions of law in its Journal Entry of Final Judgment; and (7) granting summary judgment in favor of the FDIC which denied Hulsey exoneration as guarantor of the LOH & Co. loan.
 
 Discussion
 I.
 
 16
 By counterclaim, the LOH & Co. and Hulsey, jointly, sought $5,000,000 in actual and compensatory damages for breach of contract and $15,000,000 in compensatory and punitive damages for breach of the covenant of good faith and fair dealing implied in the agreements.
 
 
 17
 The district court separated the possible agreements underlying the breach of contract counterclaims and defenses into the pre- and post-transfer time periods. Within the pre-transfer time period, appellants allege that CINB orally, (1) agreed to provide ongoing financial assistance to LOH & Co.; (2) agreed to never declare the loan in default; (3) agreed to increase the credit line annually; and (4) agreed to interest only payments for an unspecified period while LOH & Co. expanded its operations. Within this pre-transfer period, appellants also claim that CINB and/or the FDIC breached its covenant of good faith and fair dealing when it failed to effectuate the unwritten agreements and failed to make material disclosures about the possible future effects on LOH & Co. of the loan transfer to the FDIC. The district court granted summary judgment in favor of the FDIC based on these pre-transfer allegations.
 
 
 18
 The district court placed within the post-transfer time period, the breach of contract and the breach of the implied covenant of good faith and fair dealing counterclaims and defenses based on the alleged settlement agreement. As to the allegations in the post-transfer period, the district court found no settlement agreement existed and granted summary judgment in favor of the FDIC on the defenses of breach of contract and breach of an implied covenant of good faith and fair dealing. The district court also dismissed without prejudice appellants' post-transfer breach of contract and breach of the covenant of good faith and fair dealing counterclaims for lack of jurisdiction.
 
 
 19
 Because the district court's possible lack of jurisdiction over the contract and implied covenant counterclaims becomes the basis of appellants' motion to transfer the entire appeal to the Federal Circuit, we will first address these jurisdictional issues. We will then be able to sequentially address the pre-transfer breach of contract, the breach of the implied covenant of good faith and fair dealing counterclaims and defenses, and any remaining post-transfer contract-related issues.
 
 A.
 
 20
 We have appellate jurisdiction pursuant to 28 U.S.C. Sec. 1291. Our review of a district court's ruling on a jurisdictional question is de novo. FDIC v. Oaklawn Apartments, 959 F.2d 170, 173 (10th Cir.1992).
 
 
 21
 Appellants argue that the district court erroneously interpreted the interaction between 28 U.S.C. Sec. 1491(a)(1) and 28 U.S.C. Sec. 1346(a)(2) to create exclusive jurisdiction in the Claims Court for all contract actions in excess of $10,000. Appellants contend that Sec. 1491(a)(1) is not exclusive and that it applies only if another statutory provision does not waive the sovereign immunity of the United States in the district court. Appellants state that when the FDIC brings suit in a district court, 12 U.S.C. Sec. 1819(a) (Fourth) constitutes such a waiver of immunity under its "sue and be sued" clause because, as here, the governmental agency is acting within a commercial context. Further, appellants argue, by giving exclusive jurisdiction over the counterclaims to the Claims Court, the suit becomes needlessly bifurcated, draining judicial resources.
 
 
 22
 The FDIC responds that the district court properly dismissed the post-transfer breach of contract/covenant of good faith and fair dealing counterclaim. The FDIC contends, based on Farha v. FDIC, 963 F.2d 283 (10th Cir.1992), that all breach of contract claims against the FDIC for amounts over $10,000 must be brought in the Claims Court.
 
 
 23
 Absent a specific waiver of sovereign immunity, contract claims against an agency of the United States government must be brought in the Claims Court under the Tucker Act, 28 U.S.C. Sec. 1491, if the claims seek monetary relief in excess of $10,000. Id.; 28 U.S.C. Sec. 1346(a)(2). Bowen v. Massachusetts, 487 U.S. 879, 910 n. 48, 108 S.Ct. 2722, 2740 n. 48, 101 L.Ed.2d 749 (1988). Through legislation, Congress has authorized certain agencies to engage in commercial and business transactions with the public. Pursuant to this authorization, Congress has written "sue and be sued" clauses into these agencies' enabling legislation. Here, we are called upon to address the "sue and be sued" clause contained within the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) in 12 U.S.C. Sec. 1819(a) Fourth and to determine whether this clause constitutes a waiver of sovereign immunity for contract claims against the FDIC.
 
 
 24
 In FHA, Region No. 4 v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940), the Supreme Court interpreted the "sue and be sued" clause applicable to the Federal Housing Administration. The Court explained that when Congress authorizes an agency to engage in commercial and business transactions with the public, it should be as amenable as private business to the judicial process and courts should not be quick to imply restraints on suit. Burr, 309 U.S. at 245, 60 S.Ct. at 490. The Court observed that if an implied exception to the general "sue and be sued" authorization exists, it must be clearly shown that the suit is not consistent with the statutory scheme, that an implied exception is necessary to avoid grave interference with governmental function, or that Congress intended that the "sue and be sued" clause be used narrowly. Id.
 
 
 25
 In Mar v. Kleppe, 520 F.2d 867 (10th Cir.1975), in the context of the Small Business Administration (SBA), we held that the "sue and be sued" language of 15 U.S.C. Sec. 634(b), was "an express consent to suit." Id. at 870. Subsequently, in Ascot Dinner Theatre v. SBA, 887 F.2d 1024 (10th Cir.1989), our court approved a limitation on the grant of jurisdiction under Mar to those claims brought in the district court based on a contractual agreement. Id. at 1030 n. 5.
 
 
 26
 The FDIC, like the SBA, has been authorized by Congress to operate in the commercial and business context with members of the public. Based on the Supreme Court's guidelines in Burr, the FDIC has not shown that this contract claim is not consistent with the statutory scheme or that an implied exception is necessary to avoid a grave interference with the FDIC's function. Moreover, FIRREA was enacted in August, 1989, and carried forward, unchanged, the FDIC's prior "sue and be sued" clause. Congress, when enacting the comprehensive FIRREA, could have directed a more narrow interpretation. We hold, therefore, that FIRREA's "sue and be sued" clause constitutes a waiver of governmental immunity for breach of contract claims in the district court. See FDIC v. Meyer, --- U.S. ----, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (Congress permitted the Federal Savings and Loan Insurance Corporation (FSLIC) to "sue and be sued," and thus effected a broad waiver of FSLIC's immunity from suit); see also, Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision, 930 F.2d 883, 887-89 (Fed.Cir.1991) (surveying decisions on "sue and be sued" clauses and concluding that FIRREA's "sue and be sued" clause waives governmental immunity and grants the district court subject matter jurisdiction).
 
 
 27
 In Farha, we held that the Claims Court has exclusive jurisdiction over contract actions against the FDIC where the amount in controversy exceeds $10,000. Farha, 963 F.2d at 288. However, we observe that Farha did not consider, nor did it discuss, the exception found within the "sue and be sued" clause of FIRREA. We also note that the FDIC brought the initial suit in the district court. LOH & Co. and Hulsey's claims are in the form of counterclaims based on contract. For these reasons, they fall within the "sue and be sued" clause of FIRREA. The district court, therefore, has subject matter jurisdiction over them.
 
 
 28
 Because we have determined that jurisdiction is proper over all counterclaims in the district court, we deny appellants' motion to transfer the appeal to the Federal Circuit. As a result, we can now consider the remaining contract-related issues on appeal.
 
 B.
 
 29
 With respect to the pre-transfer period, the district court granted summary judgment in favor of the FDIC on the defenses and/or counterclaims based on CINB's breach of contract and breach of implied covenant of good faith and fair dealing.
 
 
 30
 Appellants argue that the district court, when deciding it did not have jurisdiction over the post-transfer contract claims, should not then have decided any of the contract claims, pre- or post-transfer. Appellants have argued only that the district court lacked the power to make those decisions and do not appeal the district court's decision as erroneous. Accordingly, we do not address the merits. Because we have held that jurisdiction over all contract claims was proper in the district court, we affirm the district court's grant of summary judgment on the pre-transfer breach of contract and breach of the implied covenant of good faith and fair dealing defenses and/or counterclaims.
 
 C.
 
 31
 Next we address all post-transfer breach of contract defenses and/or counterclaims. The district court granted summary judgment on the defense of breach of contract on the basis that there was legally insufficient evidence of a settlement agreement[4] to go to the jury. There is some dispute about whether the parties reached a settlement agreement. Thus, we will examine the district court's grant of summary judgment on this issue.
 
 
 32
 We review the district court's grant of summary judgment de novo. Oklahoma Radio Assoc. v. FDIC, 987 F.2d 685, 690 (10th Cir.1993). For summary judgment to be proper as a matter of law, there must be no genuine issue over a material fact. Russillo v. Scarborough, 935 F.2d 1167, 1170 (10th Cir.1991). Because we review the grant or denial of summary judgment de novo, we apply the same legal standard used by the district court under Fed.R.Civ.P. 56(c). Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990). Although we view the record in the light most favorable to the parties opposing the motion for summary judgment, Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir.1991), we recognize that the mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment.
 
 
 33
 Appellants contend that there are sufficient disputed facts to make summary judgment inappropriate, in that, though a settlement agreement was not formalized, the FDIC and LOH & Co. negotiated a settlement proposal which was agreed upon by LOH & Co. and thereafter approved by the FDIC's loan committee. Upon its approval, appellants claim that LOH & Co. was notified that the proposal had been approved.
 
 
 34
 The FDIC's evidence shows that its account officer recommended a proposal for settlement of the loan obligations and that there was "at least a general agreement" between the account officer and her supervisor that the proposal was acceptable. The account officer, at one point in her testimony, could not recall whether she had represented to Hulsey that a settlement agreement had been finalized. The FDIC also offered correspondence between the account officer and Hulsey postdating the alleged settlement agreement, which shows that neither side understood that a settlement had been agreed upon. The FDIC's evidence also shows that subsequent documentation demonstrates ongoing negotiations between the parties.
 
 
 35
 Viewing the evidence in the light most favorable to LOH & Co., we are convinced that there is a genuine issue of material fact as to whether a settlement agreement exists. Accordingly, summary judgment was improper. We remand this issue to the district court for a trial on the merits.
 
 
 36
 We may now address the post-transfer breach of contract counterclaims which the district court improperly dismissed for lack of jurisdiction. As we have discussed, there is a genuine issue of material fact concerning the existence of a settlement agreement. Therefore, to the extent that any of LOH & Co.'s counterclaims are based on the existence of a settlement agreement, we remand to the district court for a trial on the merits.
 
 
 37
 Finally, however, we must address any possible breach by the FDIC of the loan contracts proper. This necessarily encompasses the breach of duty of good faith and fair dealing which is implied in those loan contracts. The district court did not address these issues in its Order granting summary judgment. Accordingly, we remand these counterclaims and/or defenses to the district court for a disposition on the merits. In so doing, we do not decide whether summary judgment on these issues would be proper.
 
 II.
 
 38
 The district court granted summary judgment in favor of the FDIC as to all affirmative defenses as well as the FDIC's principal foreclosure suit both with regard to the FDIC's receipt of proceeds from the sale of oil and gas which had been extracted from the secured leasehold properties. The district court based its Order on the language of the Assignment of Production clause contained in each mortgage. Though it is not entirely clear from the briefs which affirmative defenses were disposed of as a result of the district court's Order, we will specifically encompass discharge, payment and cancellation, and failure to account for proceeds in this section's discussion as well as the tortious interference with business activities defense. To the extent that other defenses rely on the propriety of the FDIC's receipt of the proceeds, we direct the district court to apply this section's discussion.
 
 
 39
 Appellants first contend that the district court should have applied Oklahoma real property law rather than article 9 of the Oklahoma Uniform Commercial Code (UCC) when it construed the Assignment of Production clause in the mortgages.[5] Appellants argue that section 9-501(4) is clear that if real property law applies the UCC does not. In the alternative, appellants contend that, even assuming article 9 applies, the district court erroneously applied it to the Assignment of Production clause here.
 
 
 40
 Under Oklahoma real property law, appellants argue, the clause was drafted as a present assignment, but was subsequently modified by oral agreement to be enforceable only upon future default of the loan. Appellants claim the Assignment of Production clause was modified by the parties' actions when the proceeds were not actually intercepted until after default, when neither CINB nor the FDIC issued division orders to effectuate a present assignment, and when no cash collateral account was used by the Bank as required in the mortgages.[6]
 
 
 41
 Therefore, appellants contend, the modified clauses were invalid assignments upon future default under Oklahoma real property law in effect at the time the mortgages were executed in 1982[7] and the extracted oil and gas as well as the resulting proceeds remained LOH & Co.'s property. As such, appellants argue, LOH & Co. retained the right to possess the property and any rental income derived from it until appointment of a receiver or termination by foreclosure.
 
 
 42
 Alternatively, appellants contend that if article 9 of the UCC does apply to the extracted oil and gas and its proceeds, that LOH & Co. was entitled to notice before the FDIC intercepted the proceeds under section 9-505(2). Appellants claim that if notice had been given and if a cash collateral account had been set up as provided for in the mortgage, the FDIC could then have seized the account as additional collateral. However, appellants argue, because no notice was given and no cash collateral account existed at the time the proceeds were intercepted, the FDIC had no security interest in the proceeds. Therefore, appellants argue, the FDIC elected to retain the collateral in full satisfaction of the debt under UCC Sec. 9-505(2).
 
 
 43
 Finally, appellants claim, under either law, the FDIC has failed to properly account for the funds actually received.
 
 
 44
 The FDIC responds that the district court correctly applied either article 9 of Oklahoma's UCC or Oklahoma's real estate law in determining that the FDIC was entitled to collect the proceeds of oil and gas securing the loan. The FDIC argues that, under real property law, the present assignment of the oil and gas proceeds was not invalidated merely because CINB, and subsequently the FDIC, did not exercise its collection rights until after LOH & Co.'s default. We agree.
 
 
 45
 Appellants cite Continental Supply Co. v. Marshall, 152 F.2d 300 (10th Cir.1945), cert. denied, 327 U.S. 803, 66 S.Ct. 962, 90 L.Ed. 1028 (1946) for the proposition that oil and gas interests are real property interests and that real property law should apply to the leasehold and to the severed oil and gas. In Continental, we held that a mortgage of an oil and gas leasehold was a real estate mortgage even though the severed oil and gas was personal property. Id. at 306-07. The court reasoned that because oil and gas proceeds affect and relate to the real estate, real property law and mortgages should apply to the Assignment of Production clause for the purpose of securing future cash advances. Id. at 307. Continental was decided pre-UCC, however, and must be placed within this context.
 
 
 46
 Appellants are correct in identifying the tension between real property law and article 9 of the UCC when attempting to outline the scope of creditor's rights in oil and gas leases. This is a hybrid area of the law because oil and gas-related collateral have characteristics of both real and personal property. Alvin C. Harrell & Joseph R. Dancy, Oil and Gas Financing Under Uniform Commercial Code Article 9, 41 Okla.L.Rev. 53, 57 (1988). An oil and gas lease is a grant of an estate in real property, id. at 59 (citing Nicholson Corp. v. Ferguson, 114 Okla. 16, 243 P. 195 (1925), and generally will be governed by real estate law, instead of Article 9 of the UCC for recording purposes. Harrell & Dancy at 57, 59, 61.
 
 
 47
 Extracted oil and gas, however, is considered to be personal property. Continental, 152 F.2d at 306-07. See FDIC v. Sumner, 820 P.2d 1357, 1359 (Okla.Ct.App.1991). Nevertheless, the conflict arises because extracted oil and gas historically has been treated as both movable, tangible personal property under the UCC as well as the rents and profits of real property. Harrell, Oil and Gas Security Interests in the 1990s: A Need for Consistency and Uniformity, 44 Okla.L.Rev. 71 (1991).
 
 
 48
 The 1994 revised Report of the ABA UCC Committee Task Force on Oil and Gas Finance has proposed certain revisions to article 9 of the UCC to help clarify the differing means of perfecting minerals in the ground, minerals being extracted, and minerals after extraction. (Appellants' Supplemental Authority at 4). The task force recommends classifying all minerals in the ground and related interests as real property outside the scope of article 9 and including contractual interests, extracted minerals, and other tangible personal property within the scope of article 9. Id. at 25-26. The task force recommends that article 9 should recognize the relationship of extracted oil and gas to real property, as Oklahoma currently does, by allowing a mortgage or financing statement to be filed in the records of the county where the well is located. Id. at 31. Notwithstanding the personal versus real property relationship, the task force recommends that Article 9 should exclusively govern security interests in oil and gas being produced. Id. at 9-10 n. 10. Cf. Matter of Fullop, 6 F.3d 422, 428-29, 431 (7th Cir.1993) (Under Illinois law, real estate mortgage "rents and profits" clauses and article 9 are alternative routes for granting and perfecting security interests).
 
 
 49
 In Oklahoma, in order to provide for one method of covering both real and personal property, nonuniform amendments to sections 9-401 and 9-402 currently allow article 9 perfection for oil and gas leasehold estates, including minerals to be severed and the resulting accounts and proceeds, by recordation of a real estate mortgage in the county records. Id. at 28. In this case, though we are more convinced that article 9 of Oklahoma's UCC would apply, we do not decide this issue because analysis under either the UCC or real estate law leads to the same result.
 
 A.
 
 50
 Under article 9 of the UCC, the law of the state where the wellhead is located governs the perfection of an interest in "oil and gas, before extraction and which attaches thereto as extracted, or which attaches to an account resulting from a sale thereof...." 12A Okla.Stat. Sec. 9-103.1(5). Section 9-402(5) provides that a "mortgage upon lands" also covers "minerals to be severed from such lands ... and the accounts and proceeds to be derived from disposition of such minerals...." The mortgage thus constitutes "a financing statement covering such collateral and no other filing or recording [is] required to perfect the security interests in such collateral...." Id. Pursuant to 12A Okla.Stat. Sec. 9-403(7), a mortgage covering "minerals to be severed" and the resulting accounts remains effective until it is released. Id. The rights of a party secured by accounts are governed by Sec. 9-502(1) which provides:
 
 
 51
 "[w]hen so agreed, and in any event on default, the secured party is entitled to notify an account debtor or the obligor on an instrument to make payment to him whether or not the assignor was theretofore making collections on the collateral, and also to take control of any proceeds to which he is entitled under Section 9-306."
 
 
 52
 Section 9-306(1) defines proceeds as "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." It is clear that under article 9, the FDIC was entitled to contact the purchasers of the oil and gas and to take control of the proceeds both because it had been so agreed and also because default had occurred. It is also clear that the FDIC did not elect to limit its options by retaining the collateral in full satisfaction of the debt under a strict foreclosure theory. In the Assignment of Production clause, section 3.4, Assignment Not a Restriction on the Bank's Rights provides:
 
 
 53
 Nothing herein contained shall detract from or limit the absolute obligation of the Mortgagor to make payment of the Indebtedness regardless of whether the proceeds assigned by this Article are sufficient to pay the same, and the rights under this Article shall be in addition to all other security now or hereafter existing to secure the payment of the Indebtedness. (Appellants' Appendix at 752).
 
 
 54
 Moreover, 12A Okla.Stat. Sec. 9-501(4) specifically provides:
 
 
 55
 If the security agreement covers both real and personal property, the secured party may proceed under this part as to the personal property or he may proceed as to both the real and the personal property in accordance with his rights and remedies in respect of the real property, in which case the provisions of this part do not apply. Id.
 
 
 56
 This section allows the FDIC alternative ways to proceed if both real and personal property are involved. The FDIC could have chosen to proceed exclusively through foreclosure. However, by choosing to proceed under article 9 for the personal property, the FDIC was not thereafter precluded from foreclosing on the leasehold.
 
 B.
 
 57
 Under real property law, between 1979 and 1986, Oklahoma allowed present rent assignments under limited circumstances. Teachers Ins. v. Oklahoma Tower Assoc., 798 P.2d 618, 620 (Okla.1990). The rents and profits from the mortgaged real property could be assigned as additional security if the assignment (1) was contemporaneous with the execution of the mortgage; (2) covered a lease in existence when the mortgage was executed; (3) was not conditioned upon a future default; and (4) provided for immediate collection by the mortgagee of the rents and profits as the same became due. Id. at 620 n. 12. Any mortgagee who took an assignment of rents and profits had the obligation to account to the mortgagor for any rents and profits actually collected pursuant to such assignment. Id.
 
 
 58
 Here, the Assignment of Production clause is facially valid. Each clause was executed contemporaneously with the mortgage, covered existing leases, was not conditioned upon future default, and provided for immediate collection as the rents and profits became due. Thus, CINB had an immediate, though unexercised, right to the rents and profits upon execution of the mortgage and the FDIC, as CINB's successor, was entitled to enforce that right.
 
 
 59
 Moreover, section 3.3 of the Assignment of Production clause argues against a subsequent oral modification. Section 3.3 No Liability of the Bank in Collecting provides:
 
 
 60
 The Bank is hereby absolved from all liability for failure to enforce collection of any proceeds so assigned and from all other responsibility in connection therewith, except the responsibility to account to the Mortgagor for funds actually received. (Appellants' Appendix at 752).
 
 
 61
 Section 3.3 indicates that the parties agreed and understood that the collection of the proceeds was at CINB's option and that no liability would attach if CINB did not collect.
 
 
 62
 Section 3.3 also addresses Appellants' claim that LOH & Co. was entitled to an accounting for the proceeds that the FDIC actually received. Because of a lack of division orders and consistent, ongoing use of a cash collateral account, LOH & Co. did not receive sufficient information about or a proper accounting of the proceeds. Therefore, we agree that LOH & Co. is now entitled to an accounting of the oil and gas proceeds.
 
 
 63
 We affirm the district court's grants of summary judgment in favor of the FDIC as to its principal foreclosure suit; the affirmative defenses of discharge, payment and cancellation, and tortious interference with business activities; as well as any other defenses which may relate to the FDIC's receipt of oil and gas proceeds. We remand, however, to the district court for an accounting of the proceeds.
 
 III.
 
 64
 The district court dismissed six of LOH & Co.'s counterclaims against the FDIC on the grounds that they are barred by the Federal Tort Claims Act (FTCA), 28 U.S.C. Sec. 2671 et seq. and also because they are not claims in recoupment. Five of these counterclaims can be characterized as tort-based. They are: fraud/intentional misrepresentation, constructive fraud/breach of fiduciary duty, negligence, tortious interference with business activities, and intentional infliction of emotional distress.[8] Finally, the district court dismissed the last counterclaim on the basis that the FDIC in its corporate capacity does not qualify as a "bank" subject to liability for certain "tying" arrangements under the Bank Holding Company Act, 12 U.S.C. Sec. 1841 et seq. LOH & Co. and Hulsey do not appeal this dismissal.
 
 
 65
 The district court dismissed the tort-based counterclaims for lack of jurisdiction which we review de novo.
 
 
 66
 Appellants do not dispute that the FTCA bars tort suits against the United States if the conditions and exceptions within the Act have not been met. Appellants contend that this case, however, falls outside the FTCA. Appellants argue that because the FDIC filed the original action, it has waived its sovereign immunity as to these compulsory counterclaims in recoupment and that the district court has jurisdiction over them.
 
 
 67
 The FDIC contends that only two of the counterclaims are based on allegations which can be attributed to the FDIC's enforcement of the loan documents. Therefore, the FDIC argues, if claims in recoupment are allowed, only these two should be considered. The FDIC contends that the first possible counterclaim in recoupment is the tortious interference with business activities counterclaim which encompasses the receipt by the FDIC of the oil and gas proceeds. The FDIC claims that the second possible counterclaim in recoupment is the negligence counterclaim and that it involves the FDIC's duty to LOH & Co. during and after the transfer of the loan and is tied to the FDIC's alleged failure to preserve collateral to which defendants have confessed judgment. The FDIC argues that all of the remaining tort allegations are unrelated to the FDIC's Complaint and do not state claims in recoupment.
 
 
 68
 The district court has subject matter jurisdiction over counterclaims in recoupment brought against an agency of the United States. See United States v. 2,116 Boxes of Boned Beef, 726 F.2d 1481 (10th Cir.1984), cert. denied, 469 U.S. 825, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984); Jicarilla Apache Tribe v. Andrus, 687 F.2d 1324 (10th Cir.1982). "Recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded." Bull v. United States, 295 U.S. 247, 262, 55 S.Ct. 695, 700, 79 L.Ed. 1421 (1935).
 
 
 69
 Jicarilla, 687 F.2d at 1344 (quoting Frederick v. United States, 386 F.2d 481, 488 (5th Cir.1967)), provides:
 
 
 70
 It is recognized ... that when the sovereign sues it waives immunity as to claims in recoupment--arising out of the same transaction or occurrence which is the subject matter of the government's suit, and to the extent of defeating the government's claim but not to the extent of a judgment against the government which is affirmative in the sense of involving relief different in kind or nature to that sought by the government or in the sense of exceeding the amount of the government's claims; but the sovereign does not waive immunity as to claims which do not meet the "same transaction or occurrence test" nor to claims of a different form or nature than that sought by it as plaintiff nor to claims exceeding in amount that sought by it as plaintiff. Id.
 
 
 71
 In order to constitute a claim in recoupment (1) the claim must arise from the same transaction or occurrence as the plaintiff's suit; (2) the claim must seek relief of the same kind or nature; and (3) the claim must seek an amount not in excess of the plaintiff's claim. Frederick, 386 F.2d at 488.
 
 
 72
 Under the first requirement, claims in recoupment are compulsory under Fed.R.Civ.P. 13(a) because they arise out of the same transaction or occurrence that is the subject matter of the opposing party's claim. A counterclaim is compulsory if: (1) the issues of fact and law raised by the principal claim and the counterclaim are largely the same; (2) res judicata would bar a subsequent suit on defendant's claim; (3) the same evidence supports or refutes the principal claim and the counterclaim; and, (4) there is a logical relationship between the claim and counterclaim. Pipeliners Local Union, No. 798 v. Ellerd, 503 F.2d 1193, 1198 (10th Cir.1974).
 
 
 73
 Here, the FDIC, as successor to CINB, may assert those claims which CINB could have asserted but may also be subject to those counterclaims which must have been brought against CINB, as well as the FDIC, or be barred. The FDIC's suit cannot be considered in isolation; it carries all defenses with it. Viewed in this way, the issues of fact and law in the FDIC's suit and certain of the counterclaims arise out of the same debtor/creditor relationship. The FDIC's action is based on the loan agreements and Hulsey's guaranty. Certain of appellants' counterclaims arise out of actions taken in administering and collecting the loan and preserving the collateral securing the loan. Therefore, the issues of fact and law surrounding this relationship are largely the same.
 
 
 74
 Res judicata would bar LOH & Co. from bringing a subsequent claim arising out of this debtor/creditor relationship. LOH & Co. does not dispute that it made this loan or that it is in default. However, the repayment amount is in dispute and disposition of some of the counterclaims is required to fully determine the rights of each of these parties.
 
 
 75
 Even though more evidence will be necessary to support or refute the counterclaims relating to the loan agreements than is necessary to support the FDIC's suit, any evidence presented will encompass the entire relationship between the FDIC and LOH & Co. with regard to these loan agreements. This provides sufficient commonality to require all closely-related claims to be decided in one proceeding. Finally, for all of the reasons cited, there is a logical relationship between the principal claim and the counter-claims arising out of the loan agreements. Thus, we hold that the tort-based counterclaims which arise out of the loan agreements between CINB and LOH & Co. are compulsory counterclaims and therefore meet the first requirement under Frederick for claims in recoupment.
 
 
 76
 To the extent that the counterclaims allege actions involving the loan transfer agreements between CINB and the FDIC, we hold that these allegations interject new controversies into the case, are not compulsory counterclaims, and therefore are not claims in recoupment.
 
 
 77
 Second, under Frederick, the compulsory counterclaims must seek relief of the same kind or nature. This has been interpreted to mean that if the plaintiff is seeking monetary relief, the defendant's counterclaims must also seek monetary relief to qualify as claims in recoupment. See 2,116 Boxes of Boned Beef, 726 F.2d at 1490-91. Here, both the FDIC and LOH & Co. seek monetary relief. The fact that the FDIC's suit is based on contract and the counterclaims are based on tort is not significant. See Frederick, 386 F.2d at 486-89; FDIC v. Lattimore Land Corp., 656 F.2d 139, 142-43 (5th Cir.1981).
 
 
 78
 Third, the counterclaim must seek an amount not in excess of the plaintiff's claim. Appellants admit that their pleadings, in their original form, sought an amount in excess of the FDIC's claim. Therefore, if we determine that the counterclaims are claims in recoupment, appellants should be granted leave to amend the pleadings and to dismiss their prayer for punitive damages. However, if we determine that some of the counterclaims are claims in recoupment, our inquiry cannot end there. We must also determine whether other legal considerations would appropriately allow dismissal of these counterclaims. These inquiries necessitate addressing each counterclaim.
 
 
 79
 First, we address appellants' counterclaims of fraud/intentional misrepresentation, constructive fraud/breach of fiduciary duty, and negligence. To the extent that the allegations contained within these counterclaims involve the loan transfer agreement between the FDIC and CINB, we hold that these are not compulsory counterclaims and are therefore not claims in recoupment. As to these allegations, we affirm the district court's dismissal.
 
 
 80
 To the extent that the allegations contained within these counterclaims refer to oral statements or promises made before transfer of the loan to the FDIC, we hold that FIRREA, 12 U.S.C. Sec. 1821(d)(9)(A) and 1823(e), operates to bar enforcement against the FDIC of any oral side agreements between CINB and LOH & Co.[9] See Castleglen, Inc. v. Resolution Trust Corporation, 984 F.2d 1571, 1581 (10th Cir.1993).
 
 
 81
 Lattimore, 656 F.2d at 146 n. 13, addressing a similar situation, notes:
 
 
 82
 [A]n assertion of this defense [fraudulent promise of future funding] against the FDIC seems merely to convert a claim of breach into a claim of fraud. If an obligor may successfully void a note and recoup damages against the FDIC based on a claim of fraudulent inducement from an unwritten agreement, he will have made an end run around Sec. 1823(e) by asserting as fraudulent the same unwritten agreement of which a breach resulting in damages may not under Sec. 1823(e) be asserted against the FDIC. Id.
 
 
 83
 We remand to the district court to determine whether these counterclaims are based on any post-transfer actions of the FDIC and can qualify as claims in recoupment. We note that appellants have confessed judgment on the affirmative defenses relating to the FDIC's post-transfer actions in failing to preserve and protect the collateral and interfering with LOH & Co.'s correspondence. We remand to the district court for a determination of which defenses or counterclaims are thus barred. Regarding any remaining qualifying claims, appellants should be allowed to amend the pleading and dismiss the prayer for punitive damages.
 
 
 84
 Next, we address the tortious interference with business activities counterclaim. The allegations contained within this claim involve the interception by the FDIC of the oil and gas proceeds. Though this counterclaim was dismissed, the district court allowed LOH & Co. to frame it as an affirmative defense. As an affirmative defense, the district court granted summary judgment in favor of the FDIC, which we affirmed in section II. Because the counterclaim is based on the same alleged behavior as the defense, we affirm the dismissal of the tortious interference with business activities counterclaim for the reasons outlined in section II.
 
 
 85
 Finally, we address the intentional infliction of emotional distress counterclaim. An emotional distress claim is premised on extreme or outrageous conduct of the tortfeasor. It is also an intangible damage and an issue of fact within the province of the factfinder. Canady v. J.B. Hunt Transp., Inc., 970 F.2d 710 (10th Cir.1992). We held, in Katzer v. Baldor Elec. Co., 969 F.2d 935, 939 (10th Cir.1992), that to establish a prima facie case, under Oklahoma law, of intentional infliction of emotional distress, appellants must show (1) that the FDIC acted intentionally or recklessly; (2) that the FDIC's conduct was extreme and outrageous; (3) that LOH & Co. actually experienced emotional distress; and (4) that the emotional distress was severe.
 
 
 86
 The third element of the prima facie case cannot be met in this case. Since a corporation lacks the cognizant ability to experience emotions, a corporation cannot suffer emotional distress. Thus, no claim for intentional infliction of emotional distress lies. See Earth Scientists (Petro Services), Ltd. v. U.S. Fidelity & Guar. Co., 619 F.Supp. 1465, 1474 (D.Kan.1985).
 
 IV.
 
 87
 The district court granted summary judgment in favor of the FDIC on the defense of estoppel on the basis that there was legally insufficient evidence of a post-transfer settlement agreement between the parties.
 
 
 88
 As we have stated, for summary judgment to be proper as a matter of law, there must be no genuine issue over a material fact. Russillo, 935 F.2d at 1170. However, this standard presupposes that the proper prima facie test elements are used in the district court's evaluation of the evidence. See Phelps v. Fina Oil and Chem. Co., 952 F.2d 354, 356 (10th Cir.1991).
 
 
 89
 Appellants argue that the district court erred when it required a finding of a settlement agreement as a prerequisite to a promissory estoppel defense. Appellants contend that promissory estoppel is an alternate theory which does not require the existence of a settlement or contract for recovery, or in this case, as a defense to bar the FDIC's recovery.
 
 
 90
 The FDIC responds that the district court used the proper legal standard for estoppel in this case. The FDIC contends that appellants presented their estoppel defense to the district court based on a post-transfer settlement agreement. Therefore, the FDIC argues, the district court was merely responding to appellants' own argument and did not misstate the law by requiring an agreement for estoppel in every case. In this case, though we determined in section I.C. that there exists a genuine issue of material fact concerning the existence of a settlement agreement, we will discuss generally the law of estoppel as it applies to the FDIC.
 
 
 91
 Courts generally disfavor the application of the estoppel doctrine against the government and invoke it only when it does not frustrate the purpose of the statutes expressing the will of Congress or unduly undermine the enforcement of the public laws. Trapper Mining, Inc. v. Lujan, 923 F.2d 774, 781 (10th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991); United States v. Browning, 630 F.2d 694, 702 (10th Cir.1980), cert. denied, 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981). The traditional elements of estoppel are: (1) the FDIC must have known the facts; (2) the FDIC must have intended that its conduct would be acted upon or must have so acted that LOH & Co. had the right to believe that it was so intended; (3) LOH & Co. must have been ignorant of the true facts; and (4) LOH & Co. must have relied on the FDIC's conduct to its injury. Penny v. Giuffrida, 897 F.2d 1543, 1545-46 (10th Cir.1990).
 
 
 92
 In addition to the traditional elements, the Supreme Court has indicated that to successfully assert estoppel for unauthorized acts of government agents, the asserting party must show affirmative misconduct on the part of the government. Schweiker v. Hansen, 450 U.S. 785, 787-90, 101 S.Ct. 1468, 1470-72, 67 L.Ed.2d 685 (1981); Penny, 897 F.2d at 1546-47.
 
 
 93
 Affirmative misconduct is a high hurdle for the asserting party to overcome. Mere delay, though lengthy, in processing a petition is not affirmative misconduct. INS v. Miranda, 459 U.S. 14, 19, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982) (per curiam). By the same token, the erroneous advice of a government agent does not reach the level of affirmative misconduct. Schweiker, 450 U.S. at 787-90, 101 S.Ct. at 1470-72. It is far from clear that the Supreme Court would ever allow an estoppel defense against the government under any set of circumstances. See Office of Personnel Management v. Richmond, 496 U.S. 414, 422-23, 110 S.Ct. 2465, 2470-71, 110 L.Ed.2d 387 (1990). However, even assuming estoppel could be applicable, the Court has indicated that there must be a showing of affirmative misconduct on the part of the government. Id. Such a case has yet to be presented to the Court.
 
 
 94
 We reverse the Order granting summary judgment in favor of the FDIC and remand to the district court to apply the law of estoppel as set out in this section.
 
 V.
 
 95
 The district court granted summary judgment in favor of the FDIC on appellants' affirmative defense of laches based on the rule that laches is not an available defense against the FDIC as a matter of law.[10]
 
 
 96
 Appellants contend that the two-year lapse of time involved in the FDIC's handling of their loans resulted in a substantial decline in value of their collateral properties. In addition, appellants assert that the FDIC interfered with their ability to manage and monitor their secured properties by interrupting production payments and diverting appellants' correspondence resulting in further decline in value of the properties.
 
 
 97
 The FDIC argues laches is not an available defense against it as a matter of law. In the alternative, the FDIC argues that even if laches were a valid defense, appellants have confessed judgment in regards to the factual issues that formed the basis of their laches defense when confessing judgment on their affirmative defense of failure to preserve collateral. We agree.
 
 
 98
 In United States v. Summerlin, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940), the Supreme Court stated the general rule that the United States is not "subject to the defense of laches in enforcing its rights." The majority of courts follow this rule even when dealing with the FDIC in its corporate capacity. See Bostwick Irr. Dist. v. United States, 900 F.2d 1285, 1291-92 (8th Cir.1990) (whatever the application of laches to private parties, we have recognized the long-standing rule that laches does not apply in actions brought by the United States); FDIC v. Roldan Fonseca, 795 F.2d 1102, 1109 (1st Cir.1986) (the defense of laches is not available to actions brought by the FDIC in its corporate capacity and thus the fact that the FDIC waited five years after purchasing the promissory note to file suit could not enjoin the FDIC from collecting and foreclosing on the mortgage); FDIC v. Baker, 739 F.Supp. 1401, 1407 (C.D.Cal.1990) (defense of laches cannot be raised against a federal entity).
 
 
 99
 A few courts have attempted to carve out exceptions to the general rule by allowing laches against the United States in specific cases. See Clearfield Trust Co. v. United States, 318 U.S. 363, 369, 63 S.Ct. 573, 576, 87 L.Ed. 838 (1943) (laches may be asserted against United States as drawee of commercial paper for failure to give prompt notice of forgery after discovery and damage results); and Lane v. United States, 639 F.2d 758, 226 Ct.Cl. 303 (1981) (dismissal of United States' counterclaim for recovery of illicit gratuities received by federal employee from a taxpayer, on ground of laches, constituted an exception to general rule laches do not run against the sovereign).
 
 
 100
 We decline to make an exception here. We hold that the FDIC is exempt from the defense of laches. See United States v. First Nat'l Bank of Prague, Okla., 124 F.2d 484, 488 (10th Cir.1941); Roberts v. Morton, 549 F.2d 158, 163 (10th Cir.), cert. denied 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977). Even assuming the FDIC is subject to laches, appellants have failed to meet the requirements. Laches is an affirmative defense requiring a showing of (1) lack of diligence by the FDIC and (2) prejudice to appellants. Costello v. United States, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961); Roberts, 549 F.2d at 163. Notwithstanding the district court's finding that there remained a genuine controversy whether the collateral declined in value due to acts or omissions of the FDIC, appellants have failed to show a lack of diligence on the part of the FDIC. Therefore, we cannot say the FDIC is precluded from asserting its rights. The district court's grant of summary judgment in favor of the FDIC on appellants' defense of laches is affirmed.
 
 VI.
 
 101
 The district court entered a Final Journal Entry of Judgment following appellants' confession of judgment on the FDIC's foreclosure suit and the remaining affirmative defenses before trial. The remaining affirmative defenses were based on the FDIC's post-transfer actions in failing to preserve and protect the collateral and in interfering with LOH & Co.'s correspondence. Contained within the Final Journal Entry of Judgment were findings of fact and conclusions of law which appellants appeal as erroneous.
 
 
 102
 Because we have remanded certain issues, we vacate the Final Journal Entry of Judgment and remand this issue to the district court for a specific determination of the FDIC's actions to which Defendants have confessed judgment and are, therefore, estopped from raising in further proceedings.
 
 VII.
 
 103
 The district court found Hulsey to be unconditionally liable as guarantor for all obligations of LOH & Co. "based upon the clear language of the guaranty" and granted summary judgment in favor of the FDIC on Hulsey's exoneration defense.
 
 
 104
 Hulsey contends that, although he guaranteed the original obligations of LOH & Co., subsequent events materially increased his risk as guarantor and thus exonerated him from all liability under the Guaranty pursuant to Illinois law. Hulsey asserts that he did not consent to the material modifications contained within the Third Amendment to the Credit Agreement entered into by CINB and LOH & Co. on October 22, 1986. Further, Hulsey claims that, at the time of the Third Amendment, CINB deliberately failed to disclose facts related to its insolvency and involvement with the FDIC.
 
 
 105
 The FDIC contends that under the Guaranty, Hulsey agreed to all modifications of the loan, accepted the risk of such modifications, and specifically provided that nothing short of full payment and performance of all of LOH & Co.'s obligations would discharge his liability. We agree.
 
 
 106
 Interpretation of an unambiguous contract is a question of law which we review de novo. In re Amarex, 853 F.2d 1526 (10th Cir.1988). The Guaranty executed by Hulsey, individually, and CINB on October 25, 1982 provides:
 
 
 107
 ... [Hulsey] hereby unconditionally guarantees the full and prompt payment when due, whether by acceleration or otherwise, and at all times thereafter, of all obligations of [LOH & Co.] to [CINB], howsoever created, arising or evidenced, or hereafter existing, or due or to become due (all such obligations being hereinafter collectively called the "Liabilities"), and [Hulsey] further agrees to pay all expenses (including attorneys' [sic] fees and legal expenses) paid or incurred by [Continental] in endeavoring to collect the Liabilities, or any part thereof, and in enforcing this Guaranty.[11]
 
 
 108
 This is an absolute and continuing guarantee of payment in any event and shall not terminate until [CINB has] been paid in full the total amount of the Liabilities. [emphasis added]
 
 
 109
 [Hulsey] agrees that the liability under this Guaranty shall not be released, diminished, impaired, reduced, or affected by:
 
 
 110
 . . . . .
 
 
 111
 e. Any renewal, extension and/or rearrangement of the payment of any or all of the Liabilities or the performance of any covenants contained in any instrument executed in connection with or as security for the Liabilities either with or without notice to or consent of [Hulsey], or any adjustment, indulgence, forbearance or compromise that may be granted or given by [CINB] to any party;
 
 
 112
 . . . . .
 
 
 113
 g. Any failure of [CINB] to notify [Hulsey] of any renewal, extension or assignment of the Liabilities guaranteed hereby, or any part thereof, or the release of any security or of any other action taken or refrained from being taken by [CINB] against [LOH & Co.] or any new agreement between [CINB] and [LOH & Co.], it being understood that [CINB] shall not be required to give [Hulsey] any notice of any kind under any circumstances whatsoever with respect to or in connection with the Liabilities hereby guaranteed. [emphasis added]
 
 
 114
 . . . . .
 
 
 115
 This instrument shall be construed according to the laws of the State of Illinois.
 
 
 116
 [Hulsey] agrees that until LOH & Co. has fully performed all of the Liabilities [Hulsey] will not sell, mortgage, or otherwise dispose of all or any part of his interest in [LOH & Co.] without [CINB's] prior written consent. [Hulsey] further agrees that he will not be relieved of any of his obligations hereunder by reason of any permitted sale or other disposition of all or any part of his interest in [LOH & Co.] or by any act of any kind or character other than the full payment and performance by [LOH & Co.] of all of the Liabilities guaranteed hereunder. [emphasis added] (Appellants' Appendix at 632-34).
 
 
 117
 Under Illinois law, guaranty agreements should be strictly construed in favor of the guarantor. In re Tiemann, 141 Ill.App.3d 512, 95 Ill.Dec. 727, 731, 490 N.E.2d 200, 204 (1986). A guarantor is to be accorded the benefit of any ambiguity which may arise from the language of the guaranty and cannot be liable beyond a guaranty's precise terms by construction or implication. Irving Tanning Co. v. American Classic, Inc., 736 F.Supp. 161, 163 (N.D.Ill.1990); McLean County Bank v. Brokaw, 119 Ill.2d 405, 116 Ill.Dec. 561, 564-66, 519 N.E.2d 453, 456-58 (1988). Moreover, any action taken by a creditor without the guarantor's consent which increases the guarantor's risk or deprives the guarantor of the opportunity to protect himself will result in a discharge of the guarantor from his obligation. Continental Bank N.A. v. Everett, 760 F.Supp. 713 (N.D.Ill.1991); McHenry State Bank v. Y & A Trucking, Inc., 117 Ill.App.3d 629, 73 Ill.Dec. 485, 488, 454 N.E.2d 345, 348 (1983).
 
 
 118
 In this case, the Guaranty's language is unambiguous. The Guaranty contains Hulsey's unconditional promise to pay all of LOH & Co.'s existing and future obligations. It constitutes an absolute and continuing guarantee of payment in any event and in spite of any act other than full payment. Hulsey's liability under the Guaranty could not be released or reduced by any new agreements between CINB and LOH & Co. nor by any "rearrangements" of the payment of any of the liabilities. Through this guarantee, Hulsey consented to all future alterations to the loan agreement and waived any right to notice of subsequent transactions between CINB and LOH & Co.
 
 
 119
 We hold that the Guaranty is unambiguous and that Hulsey unconditionally guaranteed payment of all LOH & Co.'s liabilities whenever and however the liabilities were created. Further, he waived any rights to notice. Therefore, under Illinois law, the district court correctly found that "the liability of the guarantor must be determined from the written instrument itself and an unambiguous guaranty is enforced 'as written,' even where the guaranty contains broad statements of guarantor liability." The district court's Order granting summary judgment in favor of the FDIC on Hulsey's defense of exoneration is affirmed.
 
 VIII.
 
 120
 In summary, we (1) affirm the district court's grant of summary judgment in favor of the FDIC on the pre-transfer breach of contract and breach of the implied covenant of good faith and fair dealing defenses and counterclaims; (2) reverse and remand the district court's grant of summary judgment in favor of the FDIC on the post-transfer breach of contract defense; (3) reverse and remand the district court's dismissal of the post-transfer breach of contract and breach of the implied covenant of good faith and fair dealing counterclaims; (4) affirm the grant of summary judgment as to all claims and defenses which relate to the FDIC's receipt of oil and gas proceeds but remand for an accounting of such proceeds; (5) affirm the grant of summary judgment on the counterclaim of intentional infliction of emotional distress; (6) remand for a determination of which remaining counterclaims qualify as claims in recoupment; (7) reverse and remand the grant of summary judgment on the defense of promissory estoppel; (8) affirm the grant of summary judgment on the defense of laches; and (9) affirm the grant of summary judgment on Hulsey's defense of exoneration under the Guaranty.
 
 
 121
 In anticipation of any remanded issues in which a trial on the merits is necessary, we note that Hulsey, in his joint principal brief, stated that he, individually, was entitled to a jury trial on certain issues. (Appellants' Brief at 22 n. 14).
 
 
 122
 In an earlier appeal, Hulsey v. West, 966 F.2d 579 (10th Cir.1992), we addressed the jury trial issue. There, we granted Hulsey's petition for a writ of mandamus, recognizing Hulsey's right to a jury trial on the FDIC's claims against him notwithstanding LOH & Co.'s waiver of its right. Id. at 583. Our opinion provided:
 
 
 123
 Under the circumstances of this case, petitioner has established a clear and indisputable right to have a jury trial on the FDIC's claims against him, individually.... Petitioner conceded in the district court that he had no right to a jury trial on his claims against the FDIC. Id.
 
 
 124
 Hulsey's right to a jury trial, absent waiver by the FDIC, is limited to those issues which he, individually, may properly assert on remand. Hulsey, confessed judgment on the FDIC's suit. Moreover, the Guaranty provides in pertinent part:
 
 
 125
 [Hulsey] hereby waives notice of acceptance hereof and the presentment, demand, protest and notice of non-payment or nonperformance, or protest as to any note or obligation signed, accepted or delivered to [CINB] by [LOH & Co.] in connection with the Liabilities and [Hulsey] waives all set-offs and counterclaims[12].... [emphasis added] (Appellants' Appendix at 633).
 
 
 126
 Therefore, consistent with the language of the guaranty and our earlier opinion, Hulsey, individually, is not entitled to assert and may not, therefore, obtain a jury trial on any claim against the FDIC, on any remaining issue which can be characterized as a set-off or counterclaim, or on any issue on which he has confessed judgment.
 
 
 127
 AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable John L. Kane, Senior Judge for the United States District Court for the District of Colorado, sitting by designation
 
 
 [1]
 We are concerned in this appeal with only those leaseholds which are located in Oklahoma
 
 
 [2]
 In dismissing the counterclaims, the district court allowed LOH & Co. to pursue some of them as affirmative defenses. Where applicable, we may address these original counterclaims as "defenses and/or counterclaims."
 
 
 [3]
 Because this appeal was pending, the Claims Court granted the government's motion to dismiss under 28 U.S.C. Sec. 1500
 
 
 [4]
 Appellants discuss the alleged settlement agreement in the promissory estoppel section of their brief. However, as we discuss in section IV., an agreement is not a necessary element for promissory estoppel. Therefore, for clarity, we will follow the district court's Order and address the settlement agreement here
 
 
 [5]
 The Assignment of Production clause provides:
 
 
 [3]
 1 Assignment. As further security for the payment of the Indebtedness, the Mortgagor hereby transfers, assigns, warrants and conveys to the Bank, effective as of October 1, 1982, at 7:00 A.M., local time, all Hydrocarbons which are thereafter produced from and which accrue to the Mortgaged Property, and all proceeds therefrom. All parties producing, purchasing or receiving any such Hydrocarbons, or having such, or proceeds therefrom, in their possession for which they or others are accountable to the Bank by virtue of the provisions of this Article, are authorized and directed to treat and regard the Bank as the assignee and transferee of the Mortgagor and entitled in the Mortgagor's place and stead to receive such Hydrocarbons and all proceeds therefrom; and said parties and each of them shall be fully protected in so treating and regarding the Bank, and shall be under no obligation to see to the application by the Bank of any such proceeds or payments received by it. (Appellants' Appendix at 751-52)
 
 
 [6]
 Section 3.2 Application of Proceeds provides in part:
 All payments received by the Bank pursuant to section 3.1 (Assignment section) hereof shall be placed in a cash collateral account at the Bank ... [and then applied to pay costs and expenses of collection, interest, and principal]. (Appellants' Appendix at 752).
 
 
 [7]
 46 Okla.Stat. Sec. 4 was amended, effective November 1, 1986 and currently provides in part:
 Profits from the mortgaged real property [may be assigned] as additional security for the debts secured by the mortgage, without regard to whether such assignment provides for immediate collection, or collection upon a future default of the mortgagor, by the mortgagee or its successors, assigns or agents of the rents and profits so assigned as the same become due....
 
 
 [8]
 The sixth counterclaim, breach of the covenant of good faith and fair dealing, was addressed by the district court within its Orders disposing of the tort-based and breach of contract counterclaims. We discussed this counterclaim fully in section I. within the context of breach of contract
 
 
 [9]
 12 U.S.C. Sec. 1821(d)(9)(A) provides in pertinent part:
 [A]ny agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation. Id.
 12 U.S.C. Sec. 1823(e) is a codification of the D'Oench doctrine. D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). Section 1823(e) provides:
 No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement--
 (1) is in writing,
 (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
 (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
 (4) has been, continuously, from the time of its execution, an official record of the depository institution. Id.
 
 
 [10]
 The district court's Order of May 11, 1992 also granted summary judgment in favor of the FDIC on Appellants' affirmative defenses of waiver, release and statute of limitations. Appellants do not appeal the Order as to these claims; therefore, we do not consider them
 
 
 [11]
 The district court found in its May 18, 1992 Journal Entry of Final Judgment that the FDIC "stated in open court that it waives its right to recover its costs and attorney fees in this matter from Mr. Hulsey and the Company."
 
 
 [12]
 Although the parties did not bring this provision to our attention, we believe it is proper for us to consider its impact on any issues on remand